Filed 3/11/14

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| **SAN FRANCISCO UNIFIED SCHOOL DISTRICT ex rel. MANUEL CONTRERAS et al.,** | **A136986** |
| **Plaintiffs and Appellants,** | |
| **v.** | **(San Francisco County Super. Ct. No. CGC-07-463308)** |
| **FIRST STUDENT, INC.,** | |
| **Defendant and Respondent.** | |

California's False Claims Act (CFCA) (Gov. Code, § 12650 et seq.)[1] permits the recovery of civil penalties and treble damages from any person who knowingly presents a false claim for payment to the state or a political subdivision. Qui tam[2] plaintiffs William Padilla, Manuel Contreras, and the Environmental Law Foundation (plaintiffs) sued defendant First Student, Inc. (defendant),[3] under the CFCA, seeking to recover funds on

---

[1] All further undesignated section references are to the Government Code.

Hereafter, the federal False Claims Act (31 U.S.C. § 3729 et seq.) will be referred to as the "federal FCA."

[2] "*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who pursues this action on our Lord the King's behalf as well as his own.' " (*Vermont Agency of Natural Resources v. United States ex rel. Stevens* (2000) 529 U.S. 765, 768, fn. 1; see also § 12652, subd. (c)(1).)

[3] The complaint named Laidlaw Transit, Inc., and Laidlaw Transit Services, Inc. First Student, Inc., is the successor in interest to Laidlaw Transit, Inc., and First Transit, Inc. is the successor in interest to Laidlaw Transit Services, Inc. The action was dismissed as to Laidlaw Transit Services, Inc., and First Transit, Inc. References to "defendant" in this

1

behalf of the San Francisco Unified School District (District). Plaintiffs allege defendant violated the CFCA by submitting claims for payment to the District at times when defendant knew it was in breach of various terms of its contract to provide student bus transportation services. In particular, plaintiffs allege defendant failed to maintain its buses as required under the contract.

In *San Francisco Unified School Dist. ex rel. Contreras v. Laidlaw Transit, Inc.* (2010) 182 Cal.App.4th 438 (*Contreras I*), this court reversed the trial court's orders sustaining defendant's demurrer and dismissing the action. We concluded that, under the CFCA, a vendor impliedly certifies compliance with express contractual requirements when it bills a public agency for providing goods or services. Plaintiffs' allegation that defendant's implied certifications were false with respect to its maintenance obligations was sufficient to survive a demurrer. Subsequently, the trial court granted defendant's motion for summary judgment. The court concluded no reasonable trier of fact could find that (1) the false implied certifications were material—that it had a natural tendency to influence the District's decision to pay defendant's invoices—or (2) defendant acted with knowledge of or reckless disregard as to the falsity of its implied certifications. This appeal followed and we now reverse, concluding the evidence in the record raises triable issues of material fact on both elements of plaintiffs' claim.

PROCEDURAL BACKGROUND

Defendant is a provider of student bus transportation services. Plaintiffs Padilla and Contreras are former employees of defendant. Plaintiff Environmental Law Foundation is a California nonprofit organization "dedicated to the preservation and enhancement of human health and the environment." In May 2007, plaintiffs filed a complaint against defendant alleging violations of the CFCA. As required by the CFCA, the complaint was filed under seal to allow the District to investigate and decide whether to intervene in the action. (See § 12652, subd. (c).) The District declined to intervene.

---

decision include First Student, Inc., First Transit, Inc., Laidlaw Transit, Inc., and Laidlaw Transit Services, Inc., as appropriate.

In July 2008, plaintiffs filed their second amended and operative complaint (Complaint), seeking damages and civil penalties on behalf of the District for false claims, records, and statements presented by defendant in violation of the CFCA. Plaintiffs also sought for themselves an award, as well as payment of their attorney fees, expenses, and costs of suit.

Plaintiffs alleged defendant transported District schoolchildren on buses that were "unsafe, unhealthy, did not meet all federal, state and local safety standards, and were not properly maintained and repaired as needed." The Complaint's first cause of action alleged defendant violated section 12651, subdivision (a)(1), by knowingly presenting false claims to the District for payment or approval. It asserted, "[w]hen [defendant] submitted monthly invoices for payment, [it] impliedly certified that [it] had met each and every material term of the [C]ontract." The second cause of action alleged defendant violated the CFCA by knowingly falsifying records and/or statements; the third cause of action alleged defendant used false records or statements to avoid a payment obligation to the District. Defendant demurred to the Complaint. The trial court sustained the demurrer as to the first two causes of action and overruled the demurrer on the third cause of action. Plaintiffs dismissed the third cause of action and the court dismissed the remainder of the Complaint.

Plaintiffs appealed and, in *Contreras I*, *supra*, 182 Cal.App.4th 438, this court reversed. As to the first cause of action, we concluded that, under the CFCA, a vendor impliedly certifies compliance with its express contractual requirements when it bills a public agency for providing goods or services. (*Contreras I*, at pp. 448-453.) Plaintiffs did not challenge the dismissal of their second cause of action. (*Id.* at p. 444, fn. 6.)

In March 2012, defendant moved for summary judgment on plaintiffs' first cause of action. Plaintiffs opposed the motion. The trial court ruled in favor of defendant, concluding no reasonable trier of fact could find that defendant's alleged false implied certifications were material or that defendant acted with the scienter required by the CFCA. In September, the court entered judgment in favor of defendant.

3

This appeal followed. The California Attorney General submitted an amicus curiae brief challenging the trial court's analysis of the materiality issue.

## FACTUAL BACKGROUND[4]

### *Defendant's Contract with the District*

For over 20 years, defendant has provided bus transportation for District students. A contract effective in 2005 and extended in 2010 (Contract) imposed a number of requirements on defendant. Those requirements included provisions that defendant: (1) provide school buses meeting state and federal standards relating to pupil transportation; (2) maintain its buses in "excellent mechanical condition and appearance" and replace all vehicles "which are deemed to be unfit for providing the required service"; (3) provide buses meeting or exceeding state and federal safety standards; and (4) employ a "Fleet Maintenance Supervisor" to "establish and maintain a complete and effective preventative maintenance program with complete and accurate records on each vehicle." The Contract states that the District seeks buses with "the highest standards of performance and safety for the educational and personal well-being of the students."

The District agreed to pay defendant on a monthly basis "for services satisfactorily performed by [defendant] after receipt of properly documented invoices." The Contract authorized the District to terminate the contract without cause on 30 days' written notice, and to terminate or suspend the contract immediately for reasons including "[f]ailure or refusal" of defendant "to perform or do any act herein required."

### *Plaintiffs' Evidence of Violations of the Maintenance Requirements*

In opposing defendant's motion for summary judgment, plaintiffs presented evidence that defendant committed numerous violations of the maintenance requirements, including among other things: (1) disregarding a 45-day inspection requirement;

---

[4] In this appeal from the trial court's order granting defendant's motion for summary judgment, we view the evidence in the light most favorable to appellant. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) Our factual summary reflects this standard of review. (See *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1056, fn. 1.)

4

(2) operating buses with defective brake linings; and (3) placing buses into service with dangerously low tire tread.[5]

A. *45-Day Inspection Requirement*

California law requires a preventative maintenance inspection (PMI) of a school bus every 45 calendar days or 3,000 miles (whichever occurs first), or more often if necessary to ensure safe operation of the bus. (Cal. Code of Regs., tit. 13, § 1232, subd. (b).) The requirement is incorporated into defendant's maintenance policies. Nevertheless, defendant frequently kept buses in service beyond the 45-day inspection time limit. Alex Ageev, a lead mechanic for defendant, was responsible for ensuring compliance with the PMI requirement. He testified at his deposition that defendant would intentionally operate buses that exceeded the 45-day inspection interval when defendant got behind on maintenance. This occurred at least once a year for every bus as far back as 2001.[6]

B. *Brake Linings*

Plaintiffs, quoting from the Motor Vehicle Safety Compliance Handbook published by the California Highway Patrol (CHP), points out the CHP warns that " '[a] truck or bus operated daily on the steep hills of San Francisco obviously will require much more frequent attention to both the service brakes and the parking brake than the same vehicle would need if operated exclusively in any of the level ground communities in California's central valleys.' " (See Department of the California Highway Patrol, Motor Vehicle Safety Compliance Handbook (3d ed. 1992), p. 2-5 (CHP Handbook).) A number of defendant's buses are "Type D" buses that are required by California and

_____

[5]  Plaintiffs also contend they presented evidence that defendant failed to maintain pollution control equipment and to acquire and/or repair maintenance equipment. Because the evidence of other maintenance failures is sufficient to defeat defendant's summary judgment motion, we need not discuss plaintiffs' evidence of failures in these additional respects.

[6]  Plaintiffs assert they presented evidence there were over "610 confirmed violations" of the inspection requirement between 2008 and 2011. However, the trial court concluded plaintiffs had not established an adequate foundation for the exhibit used to support that assertion. (See *infra*, p. 23, fn. 11.)

federal law to have a brake lining thickness of at least one-fourth inch; any less renders the brakes defective. (Cal. Code Regs., tit. 13, § 1239, subd. (b) [incorporating Commercial Vehicle Safety Alliance North American Standard Out-of-Service Criteria]; 49 C.F.R., § 396.17, subd. (a) (2014); 49 C.F.R., ch. III, subch. B, appen. G.1.a.(6), eff. Sept. 24, 2013.) Defendant's maintenance manual incorporates that standard and mandates that technicians "[s]trictly adhere[]" to brake repair standards. Nevertheless, defendant's maintenance records show repeated use of Type D school buses with brake linings less than one-fourth inch in thickness. Plaintiffs assert, without dispute from defendant, their evidence shows there were 200 inspections revealing "illegal" brake linings on Type D buses between 2006 and 2011. Defendant's records also show instances where an inspection revealed brake linings significantly below one-fourth inch and yet defendant placed the bus back into service without the defective linings being replaced. Furthermore, there were instances where defendant's drivers complained about brakes problems on buses, but defendant failed to promptly inspect and repair the buses.

C. *Tire Tread*

Sections 27465, subdivision (b)(2) in combination with section 34500 of the Vehicle Code mandate that school bus tires have a tread depth of at least four thirty-seconds of an inch on tires on the "steering axle" and at least two thirty-seconds of an inch on other tires. Defendant's "Tire Replacement Policy" is more stringent, requiring replacement of tires on the steering axle with less than five thirty-seconds of an inch tread, and replacement of tires on the "drive axle" with less than three thirty-seconds of an inch tread. Nevertheless, there were a number of instances in which defendant kept buses in service after discovering in an inspection that tires violated either or both standards.

*Plaintiffs' Other Evidence*

A. *The November 2011 Episode Involving the 45-Day PMI Requirement*

In September 2011, defendant met with District officials to discuss plaintiffs' allegations. Defendant assured the District it was meeting its contractual obligations and all laws relating to student transportation. The District's representative made it clear the

6

District expected that from defendant.  Subsequently, defendant sent a letter to the District confirming that, starting on October 1, defendant would establish a "reporting process . . . to address [the District's] questions related to our preventative maintenance program."  Among other things, defendant agreed to provide the District a monthly report on the 45-day inspection program.

In November 2011, defendant sent the District a report documenting the PMI interval for the buses used in October.  Although it turned out not to be the case, it appeared to the District that 31 buses were operated out of compliance with the 45-day PMI requirement.  One of defendant's employees internally described the District's reaction as going "nuts" and "freaking out."

On November 13, 2011, the District wrote defendant, stating:

"First Student agreed to provide the District with certain reports on a regular basis on the maintenance and servicing of the vehicles transporting [District] students.  The purpose of the reports was, in part, to demonstrate that First Student was performing all the necessary vehicle maintenance and review services mandated by State law and the contract.

"Recently, First Student submitted the first '45 Day Vehicle Inspection Report'.  Upon review of the report by staff, it appears that First Student has multiple vehicles in violation of the state mandated 45 day vehicle safety inspection.  The report indicates that 18 [percent] (31 of 176) of the vehicles included in the report were overdue by from 1 to 47 days.  Besides being in violation of a State mandated safety inspection, First Student is also exhibiting disregard for Article 8, subsection 'd' of our contract.  The District cannot and will not accept this level of service from the contractor responsible for the safe transportation of its students.

"Therefore the District is directing First Student to, immediately and without delay, remove from service any vehicle where the 45 day inspection time is past and the District directs First Student to have this situation corrected by the next '45 Day Inspection Report', and that in the report no bus shall indicate being in operation after its

7

inspection due date." The District did not threaten to withhold payments or cancel the Contract.

Defendant responded in writing by assuring the District that "First Student is performing all the necessary vehicle maintenance and services mandated by state law and our contract." Defendant's letter explained that none of the "overdue" buses in the report had been placed into service past the 45-day PMI interval.

B. *Defendant's Reckless Disregard of Compliance with Maintenance Requirements*[7]

Defendant's policies require periodic audits of facilities and vehicles to ensure the adequacy of maintenance operations. For example, a monthly shop audit policy states that its goal is "to ensure that all vehicles are maintained in a SAFE, RELIABLE and CLEAN CONDITION. Vehicles must be available to meet all operational requirements at optimum cost and in accordance with First Student Operating Procedures and all relevant legislation." (Italics omitted.) The policy requires "the Service Manager/Technician-in-Charge (TIC) to perform a monthly audit to determine trends in servicing and/or reoccurring repair issues." Among other things, the monthly audit should include an audit of "10 [percent] of the vehicles which received regularly scheduled" PMI's. The policy requires that any variances from the standards must be preapproved by defendant's "Senior Vice President of Maintenance."

Plaintiffs presented evidence that defendant failed to follow those policies. Defendant's region maintenance manager for San Francisco admitted, "We don't, per se, do monthly shop audits. They would be done on an as-needed basis." He testified he did perform annual audits, but he admitted he did not have any e-mails related to those audits. He was not aware of anyone else performing an audit at the San Francisco location. In a June 2012 deposition, he admitted he had not performed an audit of the

---

[7] Plaintiffs also presented evidence defendant had actual knowledge it was not complying with its maintenance obligations. Because the evidence of defendant's reckless disregard is sufficient to defeat defendant's summary judgment motion, we need not discuss plaintiffs' evidence of defendant's actual knowledge. (See *infra*, p. 22, fn. 10.)

8

San Francisco facility in the last two years. Defendant's area general manager testified in her deposition that the way they audit is by having the drivers inspect the buses on a daily basis. She testified that, although she is responsible for ensuring compliance with defendant's inspection policies, she does not receive any regular reporting regarding compliance with those policies.

*Defendant's Additional Evidence*

Defendant presented evidence the CHP has subjected defendant's San Francisco facility and buses to annual inspections for over 20 years. The primary purpose of the CHP's terminal inspections is to ensure compliance with federal and state laws, including the 45-day PMI requirement. As explained in a declaration from the CHP inspector of defendant's facilities, the CHP inspects a "representative sample of the fleet" regarding PMI compliance, daily vehicle inspection reports, and repair records. The CHP then assigns a "compliance rating" of "satisfactory," "unsatisfactory," or "conditional." Defendant's facilities were consistently rated as "satisfactory," which meant the facilities were "in compliance with applicable laws and regulations" and any "deficiencies or defects" were "minor" and did not jeopardize "highway safety." A checklist provided to motor carriers to assist them in preparing for CHP inspections lists "[c]riteria for assignment of a Satisfactory rating," including: (1) "Vehicle/equipment condition reflects effective preventive maintenance practices"; (2) "Vehicle records reflect compliance with . . . mandated inspection intervals"; (3) "Drivers' daily vehicle inspections are performed and documented" and "[d]efects noted are corrected promptly"; and (4) "Vehicles are not operated with out-of-service conditions or defects of a long standing nature."

Defendant also presented evidence the District consistently paid defendant after receiving its monthly invoices, including in the years after plaintiffs sued defendant under the CFCA.

DISCUSSION

Plaintiffs contend the trial court erred in granting defendant's motion for summary judgment on their first cause of action for violation of section 12651, subdivision (a)(1). To obtain summary judgment, a defendant must establish " 'there is no triable issue as to

9

any material fact' " and that it " 'is entitled to judgment as a matter of law.' " (*Aguilar*, *supra*, 25 Cal.4th at p. 843.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the [plaintiff] in accordance with the applicable standard of proof." (*Id.* at p. 850, fn. omitted.) The trial court must view that evidence, and any reasonable inferences from that evidence, "in the light most favorable to" the plaintiff. (*Id.* at p. 843.) We review the trial court's ruling de novo. (*Id.* at p. 860.)

I. *Introduction to the CFCA*

In *Rothschild v. Tyco Internat. (US), Inc.* (2000) 83 Cal.App.4th 488, 494-495 (*Rothschild*), the court described the CFCA as follows:

"In 1987, the California Legislature enacted the [CFCA], patterned on a similar federal statutory scheme [citation], to supplement governmental efforts to identify and prosecute fraudulent claims made against state and local governmental entities. [Citation.] As relevant here, the [CFCA] permits the recovery of civil penalties and treble damages from any person who '[k]nowingly presents or causes to be presented [to the state or any political subdivision] . . . a false claim for payment or approval.' [Citation.] To be liable under the [CFCA], a person must have actual knowledge of the information, act in deliberate ignorance of the truth or falsity of the information, and/or act in reckless disregard of the truth or falsity of the information. [Citation.]

"The [CFCA] authorizes the Attorney General (in the case of alleged violations involving state funds) or the prosecuting authority of a political subdivision (in the case of alleged violations relating to funds of the political subdivision) to bring a civil action for violations of its provisions. [Citation.] Subject to certain limitations, the [CFCA] permits a private person (referred to as a 'qui tam plaintiff' or a 'relator') to bring such an action on behalf of a governmental agency. [Citation.]

"If a qui tam plaintiff files a [CFCA] complaint, he or she must file the complaint under seal and serve it, as well as a written disclosure of the material evidence and information in support of his or her claims, on the Attorney General. [Citation.] The Attorney General is required to notify local prosecuting authorities if local funds are

10

involved. [Citation.] The action remains sealed for 'up to 60 days' (although the statutory period is subject to extension for good cause shown) to permit the state and/or local authorities to investigate and determine whether to proceed in the action. [Citation.]

"If the state and/or a local prosecuting authority elects to proceed with the action, that agency (or those agencies) have the primary responsibility for prosecuting the action, although the qui tam plaintiff has the right to continue as a party to the action. [Citation.] If no prosecuting authority decides to proceed with the action, the qui tam plaintiff has the right to do so subject to the right of the state or political subdivision to intervene in certain circumstances. [Citation.] Regardless of who prosecutes the qui tam action, if it is successful, the qui tam plaintiff is entitled to a percentage of the recovery achieved in the case. [Citation.]" (Accord, *Contreras I*, *supra*, 182 Cal.App.4th at pp. 445-446.)

"The Legislature designed the CFCA ' "to prevent fraud on the public treasury," ' and it ' "should be given the broadest possible construction consistent with that purpose." ' [Citations.] In other words, the CFCA ' "must be construed broadly so as to give the widest possible coverage and effect to the prohibitions and remedies it provides." [Citation.]' [Citations.] The CFCA is intended 'to supplement governmental efforts to identify and prosecute fraudulent claims made against state and local governmental entities.' [Citation.] Given the 'very close similarity' of the CFCA to the [federal FCA], 'it is appropriate to turn to federal cases for guidance in interpreting the [CFCA].' [Citations.]" (*Contreras I*, *supra*, 182 Cal.App.4th at p. 446.)

II. *There Are Triable Issues of Material Fact as to Plaintiffs' Implied Certification Claim Under the CFCA*

The Complaint alleges a fraud on the District, in that defendant sought payments from the District while knowingly failing to provide the services for which the District contracted—to wit, student transportation on properly maintained buses. In *Contreras I*, *supra*, 182 Cal.App.4th 438, we rejected defendant's contention it was immune from liability under the CFCA because its invoices did not expressly assert compliance with the requirements of the Contract and because the Contract did not require certification of compliance with contractual terms as a prerequisite to payment. (*Contreras I*, at p. 447.)

11

We concluded defendant's invoices were "claims" within the meaning of the CFCA; the invoices did not need to contain an expressly false statement to be actionable; and defendant's requests for payment under the Contract included "an implied certification of compliance with contractual requirements that, if false and fraudulent, can form the basis for a CFCA action." (*Contreras I*, at pp. 447-448.)

We discussed a number of state and federal decisions in upholding plaintiffs' implied certification theory of violation of the CFCA. (*Contreras I*, *supra*, 182 Cal.App.4th at pp. 448-452.) We also rejected defendant's assertion that "plaintiffs' construction of the CFCA 'would enable any private party to sue based on any purported breach of any public entity's contract.' " (*Contreras I*, at p. 452.) In doing so, we pointed out several limitations on liability under the CFCA. Among other things, we pointed out that "the implied certification of compliance with the breached contract provision 'must be material to the government's decision to pay out moneys to the claimant' [citations]" and "the contractor must have the requisite knowledge, rendering the failure to disclose the contractual noncompliance fraudulent." (*Contreras I*, at p. 452.) In granting defendant's summary judgment motion, the trial court concluded that, as a matter of law, defendant's alleged false implied certifications were not material and defendant did not have the requisite knowledge of the alleged falsity of the implied certifications. We consider each of those elements in turn.

A. *Materiality*

"The CFCA does not expressly require a showing of materiality to support the imposition of a statutory penalty for the submission of a false claim. Under section 12651, subdivision (a)(1), a person who '[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval' is 'liable to the state or political subdivision for a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) for each violation.' (Stats. 2009, ch. 277, § 2.) Nevertheless, a number of courts have concluded that the federal FCA contains an implicit materiality requirement, because it would not effectuate the intent of the statute to impose a penalty based on a falsity which would not have influenced the public

12

entity's payment decision. [Citations.]" (*Contreras I*, *supra*, 182 Cal.App.4th at p. 454.) "[A]n alleged falsity satisfies the materiality requirement where it has the ' " 'natural tendency to influence agency action or is capable of influencing agency action.' " [Citation.]' [Citation.]" (*Ibid.*)

In *Contreras I*, we concluded plaintiffs' allegations were sufficient to satisfy the materiality requirement because defendant's "implied certification that it had satisfactorily performed its material obligations under the Contract, including provisions designed to protect the health and safety of the student population, had a ' " 'natural tendency' " ' [citation] to cause the District to make payments it would not have made had it been aware of [defendant's] noncompliance." (*Contreras I*, *supra*, 182 Cal.App.4th at p. 455.) Essentially, we concluded that defendant's alleged falsities were material as a matter of common sense. (*U.S. v. Dolphin Mortg. Corp.* (N.D.Ill. 2009) 2009 WL 153190, p. *11 [relying on "common sense" in materiality analysis]; *U.S. ex rel. Durcholz v. FKW Inc.* (S.D.Ind. 1998) 997 F.Supp. 1159, 1170 [same].)

We also noted in *Contreras I* that plaintiffs' "materiality showing [was] strengthened by various provisions of the Contract . . . that reflect the District's concern with bus maintenance and safety . . . ." (*Contreras I*, *supra*, 182 Cal.App.4th at p. 455.) For example, article 8(d) of the Contract provides, "All buses shall be in excellent mechanical condition and appearance at the beginning of the Contract and shall be maintained in that condition at all times during the term of the Contract. The Superintendent and/or his designees reserves the right to inspect motor vehicle equipment at any time during the term of the Contract." Article 12 of the Contract states, "It is the intent of the District to obtain the best quality transportation available and which incorporates the highest standards of performance and safety for the educational and personal well-being of the students." This connection between maintenance and student safety is also reflected in the CHP Handbook: "In the CHP's experience, public attitudes have always supported requirements for superior maintenance and more stringent maintenance regulations for . . . [s]chool buses, school pupil activity buses, and general public paratransit vehicles . . . ."

13

Although we concluded in *Contreras I* that plaintiffs' allegations were sufficient to survive defendant's demurrer, we also pointed out that the issue of materiality was ultimately a mixed question of law and fact, "and a showing in a motion for summary judgment or at trial that the alleged breach would not have affected the payment decision will defeat a CFCA claim." (*Contreras I*, *supra*, 182 Cal.App.4th at p. 456.) To exemplify the point, we discussed a federal decision, *U.S. ex rel. Berge v. Trustees of Univ. of Ala.* (4th Cir. 1997) 104 F.3d 1453 (*Berge*): "There, the defendants appealed from denial of their motion for judgment as a matter of law following a jury verdict finding them liable under the federal FCA. [Citation.] The defendants were funded by the National Institutes of Health (NIH) to conduct research regarding a common cause of birth defects. [Citation.] The qui tam plaintiff alleged the defendants had made false statements to the NIH in annual progress reports including, among other things, assertions about the amount of data that had been computerized. [Citation.] The Fourth Circuit reversed denial of the motion for judgment because there was no substantial evidence from which a reasonable jury could conclude the defendants' errors and omissions 'were materially capable of influencing' the government's funding decision. [Citation.] The court pointed out that the program officer with responsibility for the grant testified that 'the principal purpose of the project was the collection of data, not its computerization.' [Citations.]" (*Contreras I*, at pp. 456-457.)

In the present appeal, defendant does not dispute that plaintiffs have presented evidence of a substantial number of maintenance failures and that the condition of defendant's buses is a matter of great importance to the District. Instead, defendant argues its evidence shows the alleged false implied certifications were *not* material because the District declined to intervene in the present action, declined to bring an action of its own for breach of contract, always paid defendant's monthly invoices in full, and extended the Contract in 2010. Defendant asserts, "Since [the District] in fact continued to pay, even though it knew of the alleged falsity of [defendant's] claims, [defendant] established that any such alleged falsity did not have any natural tendency or capability to influence [the District's] payment decision." The trial court accepted this

14

argument below, stating "It is undisputed that [the District] was aware of violations of contractual provisions via both the allegations in the lawsuit and the [November 2011] letter and despite this knowledge continued to pay on [defendant's] submitted invoices. This showing that the alleged breach did not affect the District's payment decision defeats the CFCA claim." Defendant's reasoning is misplaced for several reasons.

First, defendant has not established a critical factual predicate to giving *any* significance to the District's reaction to the plaintiffs' allegations—that the District *knew* about the falsity of defendant's implied certifications. Instead, the evidence shows the District became aware of plaintiffs' *allegations*, which defendant *denied*. Accordingly, the present case is unlike the case upon which defendant relies, *U.S. ex rel. Yannacopoulos v. General Dynamics* (7th Cir. 2011) 652 F.3d 818, in which the governmental entity obtained actual knowledge of the defendants' wrongdoing. In *Yannacopoulos*, the defendant sold fighter jets to Greece; Greece borrowed the funds for the purchase from the United States government, which paid the defendant directly. (*Id.* at p. 821.) The plaintiff claimed the defendant made a number of false statements to the United States in obtaining payments. (*Id.* at p. 823.) As relevant here, the plaintiff alleged the defendant failed to disclose promptly to the United States its decision to delete a certain clause from a draft contract for the aircraft sale. (*Ibid.*) The Seventh Circuit concluded the district court properly granted summary judgment to the defendant on the claim on the ground of materiality, because the government agency took no adverse action when it "actually learned of" omission of the clause. (*Id.* at p. 831.) There was also evidence the clause was of no substantive importance (*id.* at p. 830) and "unenforceably vague" (*id.* at p. 831), and the government approved the final contract without the clause at issue (*ibid.*).

In the present case, there is no evidence the District had actual knowledge of defendant's wrongdoing—as opposed to allegations of wrongdoing—and there is no evidence the contractual maintenance requirements were unimportant to the District. Accordingly, the present case is also distinguishable from *Berge*, where the contracting entity " 'determined that the information [the plaintiff] alleged was false or

15

misrepresented was not material to its funding decisions.' " (*Berge*, *supra*, 104 F.3d at p. 1460.) In sum, defendant cites no evidence suggesting the District would have considered the alleged maintenance failures immaterial, *if the District knew the allegations were true*.

Second, as the Attorney General argues in her amicus brief, even assuming the District were aware defendant had failed to comply with the contractual maintenance requirements, the District's reaction would not be dispositive. The materiality determination turns on whether the alleged false statement was such that it had a natural tendency to influence or was capable of influencing government action. (*Contreras I*, *supra*, 182 Cal.App.4th at p. 454.) We agree with the decisions under the federal FCA that have concluded the materiality test "focuses on the potential effect of the false statement when it is made, not on the actual effect of the false statement when it is discovered." (*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.* (4th Cir. 2003) 352 F.3d 908, 916-917 (*Harrison*); accord, *U.S. ex rel. A+ Homecare, Inc. v. Medshares Management Group, Inc.* (6th Cir. 2005) 400 F.3d 428, 445 (*Medshares*); see also *U.S. v. Rogan* (7th Cir. 2008) 517 F.3d 449, 452; *U.S. ex rel. El-Amin v. George Washington Univ.* (D.D.C. 2008) 533 F.Supp.2d 12, 22 (*El-Amin*); *U.S. States ex rel. Oliver v. The Parsons Corp.* (C.D.Cal. 2006) 498 F.Supp.2d 1260, 1289-1290.)

Thus, the government contracting entity's *actual* reaction upon learning of a false claim is not dispositive of the issue of materiality. If a false statement was clearly material when it was made, the fact that the contracting entity did not treat the falsity as material upon discovering it would not preclude a claim under the CFCA. This is consistent with the important remedial purposes of the CFCA and our obligation to construe the law broadly. (*Contreras I*, *supra*, 182 Cal.App.4th at p. 446.) As the materiality requirement itself is a judicially-created restriction on the scope of the law's application (*id.* at p. 454), the requirement should not be construed as immunizing conduct the CFCA sought to sanction. The CFCA, like the federal FCA, is " 'intended to reach all types of fraud, without qualification, that might result in financial loss to the [g]overnment.' [Citation.]" (*U.S. ex rel. Hendow v. University of Phoenix* (2006) 461

16

F.3d 1166, 1170 (*Hendow*); accord, *Contreras I*, at p. 449; see also *State of California v. Altus Finance* (2005) 36 Cal.4th 1284, 1297 (*Altus Finance*) [" '[t]he ultimate purpose of the [CFCA] is to protect the public fisc.' "].) The standard of materiality adopted by the trial court would immunize certain instances of significant fraud and weaken the CFCA's effectiveness at "policing the integrity of the government's dealings with those to whom it pays money." (*Harrison*, *supra*, 352 F.3d at p. 917.) *Harrison*'s conclusion with respect to the federal FCA is equally applicable to the CFCA: Courts best give effect to the law "by holding a party liable if the false statement it makes in an attempt to obtain government funding has a natural tendency to influence or is capable of influencing the government's funding decision, not whether it actually influenced the government not to pay a particular claim." (*Harrison*, at p. 917; see also *U.S. v. Rivera* (1st Cir. 1995) 55 F.3d 703, 709 (*Rivera*) [the federal FCA reflects "a congressional judgment that fraud by government contractors is best prevented by attacking the activity that presents the risk of wrongful payment, and not by waiting until the public fisc is actually damaged"].)

This focus on materiality at the time a false claim was presented finds further support in the proposition that a party can be subject to liability under the CFCA even if a false claim does not actually result in a loss to the government, " 'for example, where the government discovers that a claim is false before it makes payment.' " (*McVeigh v. Recology San Francisco* (2013) 213 Cal.App.4th 443, 459, quoting *U.S. ex rel. Sanders v. American-Amicable Life, TX* (3d Cir. 2008) 545 F.3d 256, 259; see also *Altus Finance*, *supra*, 36 Cal.4th at p. 1299 ["the CFCA authorizes civil penalties for attempts to misappropriate public funds that were not in fact completed by payment from the treasury"]; *Medshares*, *supra*, 400 F.3d at pp. 445-446; *Rivera*, *supra*, 55 F.3d at p. 709.) If a violation of the CFCA is complete with the submission of a false claim for payment, then the government's actual response to the claim cannot be dispositive on the issue of materiality.

Third and finally, although defendant does not appear to dispute the general proposition that a contracting agency's response is not legally dispositive of the issue of materiality, defendant nevertheless argues the District's response constitutes evidence

17

that determines the issue of materiality in its favor as a matter of law.  We disagree.  Accepting that the District's actual reaction has some relevance to the materiality determination, the trial court erred in concluding a reasonable trier of fact could *only* infer a *lack* of materiality from the District's response to plaintiffs' allegations— including its decisions not to intervene, not to bring its own suit for breach of contract, to continue to make payments on the Contract, and to extend the Contract.

Contrary to defendant's view, the District's decisions not to intervene or bring suit for breach of contract could simply reflect a judgment that plaintiffs' claims should be resolved in the present action at minimal cost to the District.  (*U.S. ex rel. Chandler v. Cook County, Ill.* (7th Cir. 2002) 277 F.3d 969, 974, fn. 5 (*Chandler*).)  Moreover, "assuming the government looked unfavorably upon each *qui tam* action in which it did not intervene would seem antithetical to the purpose of the *qui tam* provision—to encourage private parties to litigate on behalf of the government."  (*El-Amin*, *supra*, 533 F.Supp.2d at p. 21; see also *U.S. ex rel. Atkins v. McInteer* (11th Cir. 2006) 470 F.3d 1350, 1360, fn. 17; *U.S. ex rel. Williams v. Bell Helicopter Textron, Inc.* (5th Cir. 2005) 417 F.3d 450, 455; *Chandler*, at p. 974, fn. 5; *Berge*, *supra*, 104 F.3d at p. 1458.)

Furthermore, the District's decision to continue to make payments could reflect acceptance of defendant's representations of compliance, the expense and difficulty of investigating the allegations of wrongdoing, fear of litigation with defendant, or concerns about the possibility of disrupting services.  (See *Harrison*, *supra*, 352 F.3d at p. 917 ["we can foresee instances in which a government entity might choose to continue funding the contract despite earlier wrongdoing by the contractor"]; *U.S. ex rel. Gillespie v. Kaplan University* (S.D.Fla. 2012) 2012 WL 1852085 , p. *4 [government's continued payments did not defeat materiality showing where defendants entered into agreement to correct their noncompliance].)  Finally, the District's decision to extend the contract could reflect a judgment that, regardless of whatever past maintenance problems existed,

defendant is now complying with its contractual obligations.[8]  Although none of those suggested inferences favorable to plaintiffs' claims are supported by direct evidence, neither is defendant's suggested inference that the District's restrained response shows the implied false certification was *not* material.

In addition, a reasonable trier of fact could infer that the District's reaction to what it believed to be an admission of noncompliance by defendant showed it considered the maintenance requirements in the Contract to be of great importance.  Thus, when in November 2011 the District received information from defendant that it believed showed defendant had committed multiple violations of the 45-day PMI requirement in October, the District immediately notified defendant in writing that the District "cannot and will not accept this level of service from the contractor responsible for the safe transportation of its students."  The District directed defendant to "immediately and without delay" remove from service buses not in compliance with the inspection requirement and required that in the next report "no bus shall indicate being in operation after its inspection due date."  In internal communications, one of defendant's employees described the District's reaction as going "nuts" and "freaking out."  Defendant argues the incident demonstrates a *lack of* materiality, because the District did not actually cease paying defendant, attempt to recover past payments, demand liquidated damages, or threaten to terminate the Contract.  However, that is not the only, or even the most, reasonable inference from the episode, because defendant promptly assured the District there were no PMI violations in October 2011.  More broadly, defendant had recently told the District it was in compliance with the Contract and all applicable laws.  That the District did not threaten to withhold payments or take other such steps without providing

8    On January 14, 2014, respondent requested that this court take judicial notice of District agenda and minutes, both dated June 25, 2013, reflecting renewal of the District's bus transportation contract with respondent through June 2014.  However, in reviewing the 2012 ruling on respondent's motion for summary judgment, "we will consider only the facts properly before the trial court at the time it ruled on the motion."  (*Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1601.)  Respondent cites no authority to the contrary.  In any event, for the reasons discussed herein, the 2013 contract renewal would not affect our analysis.  The request for judicial notice is denied.

19

defendant an opportunity to respond does not necessarily show that the alleged implied false certifications regarding the maintenance requirements were not capable of influencing the District's payment decisions. A more reasonable inference is that the episode shows the maintenance requirements *were* material, but the District decided to accept defendant's assurances of compliance.

In sum, the record shows a triable issue of material fact as to materiality. A conclusion that the alleged false implied certification *was* material is supported by common sense, by the language of the Contract, and by reasonable inferences from the District's reaction when presented with evidence of potential violations of the PMI requirement in late 2011. On the other hand, a conclusion that the alleged false implied certification was *not* material is supported by competing inferences from the District's response to plaintiffs' allegations and the late 2011 incident. The conflicting evidence and inferences precluded grant of summary judgment on the ground that plaintiffs could not demonstrate materiality as a matter of law. (*Cohen v. Five Brooks Stable* (2008) 159 Cal.App.4th 1476, 1497 [" ' "Only when the inferences are indisputable may the court decide the issues as a matter of law." ' "].)

B. *Knowledge*

The trial court also concluded that, as a matter of law, defendant did not have the requisite knowledge of the falsity of its implied certifications of contract compliance. As noted previously, the CFCA is violated by a person who "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval." (§ 12651, subd. (a)(1).) The CFCA provides that "knowingly" means that a person, with respect to the alleged false information at issue in the claim, "[h]as actual knowledge of the information," "[a]cts in deliberate ignorance of the truth or falsity of the information," or "[a]cts in reckless disregard of the truth or falsity of the information." (§ 12650, subd. (b)(3); see also *Contreras I*, *supra*, 182 Cal.App.4th at pp. 452-453; *Rothschild*, *supra*, 83 Cal.App.4th at pp. 494-495.) "Proof of specific intent to defraud is not required." (§ 12650, subd. (b)(3).)

20

The definition of "knowingly" in the federal FCA is the same as the definition in the CFCA, and, in adopting the federal FCA definition, "Congress attempted 'to reach what has become known as the "ostrich" type situation where an individual has "buried his head in the sand" and failed to make simple inquiries which would alert him that false claims are being submitted.' [Citation.] Congress adopted 'the concept that individuals and contractors receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek.' [Citations.]" (*U.S. v. Bourseau* (9th Cir. 2008) 531 F.3d 1159, 1168; see also *Gulf Group General Enterprises Co. W.L.L. v. U.S.* (Ct.Cl. 2013) 114 Fed.Cl. 258, 314 ["The standard was designed to address 'the problem of the "ostrich-like" refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know.' [Citation.] Thus, the [federal FCA] covers not just those who set out to defraud the government, but also those who ignore obvious deficiencies in a claim."]; *U.S. ex rel. Ervin and Associates, Inc. v. Hamilton Securities Group, Inc.* (D.D.C. 2005) 370 F.Supp.2d 18, 42 ["[t]he standard of reckless disregard . . . was designed to address the refusal to learn of information which an individual, in the exercise of prudent judgment, should have discovered"]; but see *U.S. ex rel. Hefner v. Hackensack University Medical Center* (3d Cir. 2007) 495 F.3d 103, 109 ["Congress specifically expressed ' "its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence." ' "].) Among other things, "A failure to make a minimal examination of records can constitute deliberate ignorance or reckless disregard, and a contractor that deliberately ignores false information submitted as part of a claim can be found liable under the" federal FCA. (*Gulf Group*, at p. 315.) The plain language of the CFCA reflects similar legislative intent. (See *Thompson Pacific Construction, Inc. v City of Sunnyvale* (2007) 155 Cal.App.4th 525, 548 (*Thompson*) [reckless disregard standard in federal FCA and CFCA "indistinguishable"].)[9]

---

[9]  Defendant cites federal cases stating that liability under the federal FCA requires that the defendant told a "lie." (*Hendow, supra,* 461 F.3d 1166 at p. 1172; *U.S. ex rel. Hochman v. Nackman* (1998) 145 F.3d 1069, 1073.) Those cases make no attempt to

Plaintiffs argue the payment claims at issue in the present case were presented in reckless disregard of the truth or falsity of whether defendant was in compliance with the Contract's maintenance standards because defendant disregarded its own audit policies, which defendant was contractually obligated to follow in providing services to the District.[10]  Among other things, although defendant's policies required monthly internal audits, defendant's region maintenance manager for San Francisco admitted the company did not perform monthly audits.  The San Francisco location manager admitted in her deposition that, with the exception of two particular audits, she was not aware of any audits of the location's maintenance records, other than CHP audits.  Defendant's area general manager testified in her deposition that, although she is responsible for ensuring compliance with defendant's inspection policies, she does not receive any regular reporting regarding compliance with those policies.

Plaintiffs also argue a finding defendant acted in reckless disregard of the truth of its implied certifications of contractual compliance is supported by the evidence of widespread and persistent violations of contractual maintenance requirements.  Among other things, plaintiffs presented evidence the 45-day PMI requirement was missed for every bus at least once every year, and they assert their evidence showed over 200 instances of illegally thin brake linings on buses between 2006 and 2011.  Defendant does not dispute plaintiffs' evidence of widespread maintenance failures, other than to argue that one exhibit quantifying violations of the PMI requirement was properly ruled

harmonize that assertion with the reckless disregard basis for liability specified in both the federal FCA and the CFCA. "The CFCA does not demand a deliberate lie but allows for liability where the defendant acts in deliberate ignorance or in reckless disregard of the truth of the claim." (*Thompson*, *supra*, 155 Cal.App.4th at pp. 549-550.)

[10]  Plaintiffs also argue there is a triable issue of material fact as to defendant's *actual knowledge* of the falsity of its implied certifications.  Because we conclude there is a triable issue as to the reckless disregard aspect of the knowledge element, we need not and do not consider whether there is also a triable issue as to the actual knowledge aspect of the element.

22

inadmissible by the trial court.[11]  We agree the frequency of the maintenance failures provides further basis for a reasonable inference that defendant acted in reckless disregard of the truth of its implied certifications of compliance with the Contract.  (See *U.S. v. Cabrera-Diaz* (D.P.R. 2000) 106 F.Supp.2d 234, 238 [hundreds of instances of regular Medicare overbilling established that defendant acted, at least, in reckless disregard of the truth of his claims].)

The present case is analogous to *U.S. ex rel. Compton v. Midwest Specialties, Inc.* (6th Cir.1998) 142 F.3d 296, 304, where the court held the "reckless disregard" aspect of the knowledge element of a federal FCA claim was satisfied where a military supplier sought payment for jeep brake shoes even though the shoes had not been tested as required under the contract.  (See also *Laymon, Jr. v. Bombardier Transp.* (*Holdings*) *USA, Inc.* (W.D. Pa. Mar. 23, 2009)  2009 WL 793627, p. *12 [defendant failed to take steps to ensure the accuracy of cost reports submitted to government]; *United States v. Raymond & Whitcomb Co.* (S.D.N.Y. 1999) 53 F.Supp.2d 436, 447 [defendant failed to investigate whether mailings qualified for nonprofit status].)  Similarly, plaintiffs have presented evidence that defendant failed to comply with its own policies requiring regular audits that could have disclosed the maintenance failures at issue in the present case.

On appeal, defendant cites some limited evidence it conducted inspections and maintenance on particular buses in its fleet, but it does not dispute plaintiffs' evidence of

---

[11]  Exhibit 84 in opposition to defendant's motion for summary judgment was described by plaintiffs' counsel as a "printed representation of electronic data that is contained within the Web Fleet Assistant database maintained by [defendant]" and produced by defendant in electronic format.  Plaintiffs assert Exhibit 84 shows there were over 600 violations of the mandatory 45-day inspection requirement over a four-year period.  The trial court ruled the exhibit was inadmissible for lack of a proper foundation.  Plaintiffs contend the court erred, but suggest this court need not reach the issue because plaintiffs also presented deposition testimony from a lead mechanic that the inspection requirement was frequently violated.  We agree plaintiffs' evidence is sufficient to survive summary judgment even without considering Exhibit 84.  Accordingly, we need not and do not consider whether the trial court erred.  The decision in *People v. Zavala* (2013) 216 Cal.App.4th 242, 246-249, may be of assistance to the trial court in determining whether the exhibit is admissible at trial.

23

defendant's *overall* failure to take reasonable steps to ensure compliance with the Contract's specific maintenance requirements. Instead, defendant relies on language in the Contract that the District was obligated to pay "monthly in arrears for services satisfactorily performed by [defendant] after receipt of properly documented invoices." Defendant then asserts, "[t]he evidence showed that [defendant] had a reasonable belief that it had satisfactorily performed the services covered by each invoice." In support of that assertion, it points to evidence the CHP has subjected defendant's San Francisco facility and buses to annual inspections for over 20 years, in order to ensure compliance with federal and state laws. After each terminal inspection, the CHP assigned its "compliance rating" of "satisfactory" to defendant's facilities. "Satisfactory" was the highest available rating, and it meant the facilities were "in compliance with applicable laws and regulations" and any "deficiencies or defects" were "minor" and did not jeopardize "highway safety." The trial court essentially treated the CHP inspections as dispositive, stating "It is undisputed that [defendant] consistently received the highest rating possible from the CHP after inspections. It is also undisputed that the CHP inspections included assurances and certifications that [defendant] was in compliance with all applicable laws and regulations. This showing that [defendant] did not have the scienter required under the CFCA defeats the CFCA claim."

Although the CHP inspections may have been enough to satisfy defendant's burden of making a prima facie showing in moving for summary judgment (*Aguilar*, *supra*, 25 Cal.4th at p. 850), it was not sufficient to resolve the knowledge issue as a matter of law in the face of plaintiffs' evidence, detailed above.[12] Moreover, plaintiffs

[12] Contrary to defendant's assertion, plaintiffs' evidence did not merely support a conclusion that its compliance with the Contract was imperfect. Plaintiffs' evidence raised a triable issue whether its performance was satisfactory within the meaning of the Contract. Moreover, the District's payment of defendant's invoices, extension of the Contract, and decision not to intervene in the present lawsuit or bring its own lawsuit for breach of contract does not demonstrate satisfactory performance where defendant did not disclose its maintenance failures to the District. (*Shaw v. AAA Engineering & Drafting, Inc.* (10th Cir. 2000) 213 F.3d 519, 534 [alleged government knowledge of wrongdoing did not provide defense where it was the plaintiff who informed the

24

presented reasons to doubt the significance of the annual CHP inspections and the reasonableness of relying on those annual inspections to ensure compliance with the maintenance requirements in the Contract. The CHP inspector had no knowledge of the Contract's maintenance requirements and he did not purport to determine whether defendant was in compliance with the Contract. The inspector stated in his deposition that he performed between 150 and 180 terminal inspections per year, which raises a reasonable inference that defendant should have known the inspections were not thorough enough to substitute for its own maintenance and inspection program. The CHP Handbook states: "The inspections performed by the CHP or any other regulatory agency do not count as part of any motor carrier's own preventative maintenance program." Finally, plaintiffs presented evidence CHP standards for a "satisfactory" rating are different from and/or not as stringent as the standards in the Contract. On appeal, respondent fails to directly dispute the evidence cited by plaintiffs on that point. We conclude plaintiffs' evidence demonstrates that different reasonable inferences can be made about the appropriateness of defendant's purported reliance on the CHP inspections to ensure compliance with contractual maintenance requirements. As we pointed out previously, " ' "Only when the inferences are indisputable may the court decide the issues as a matter of law." ' " (*Cohen*, *supra*, 159 Cal.App.4th at p. 1497.) Accordingly, the trial court erred in giving the CHP inspections dispositive effect in considering whether plaintiffs could establish that defendant acted in reckless disregard as to the truth of its implied certifications of compliance with contractual maintenance requirements.

For the above reasons, the trial court erred in concluding, as a matter of law, that plaintiffs could not establish the knowledge element of their CFCA claim.

## DISPOSITION

The trial court's judgment is reversed. Costs on appeal are awarded to plaintiffs.

---

government of the wrongdoing and the defendant was not forthcoming]; see also *ante*, pp. 15-19.)

_____
SIMONS, J.

We concur.

_____
JONES, P.J.

_____
NEEDHAM, J.

Superior Court of the City and County of San Francisco, No. CGC-07-463308, Ernest H. Goldsmith, Judge

Baron & Budd, P.C., Thomas M. Sims and Laura J. Baughman; April M. Strauss; Environmental Law Foundation and James Wheaton, for plaintiff and appellants.

Reed Smith LLP, Jesse L. Miller, Dennis Peter Maio, James M. Neudecker and Matthew T. Peters, for defendant and respondent.

Kamala D. Harris, Attorney General, Martin Goyette, Assistant Attorney General, Larry G. Raskin, Deputy Attorney General, as Amicus Curiae on behalf of for plaintiffs and appellants.