# District of Columbia
# Court of Appeals

**No. 15-CV-59**

DARRELL JOHNSON, *et al.*,



FILED

AUG 11 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

Appellants,

v.

CAB-4227-13

DISTRICT OF COLUMBIA,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Civil Division

BEFORE: FISHER and BECKWITH, *Associate Judges*; and FERREN, *Senior Judge*.

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the summary judgment for appellee's claim as to appellants' liability under the False Claims Act is affirmed, but the case is remanded for further findings and a legal ruling to determine the appropriate amount of treble damages consistent with this opinion. The trial court's order as to unjust enrichment is vacated.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: August 11, 2016.

Opinion by Senior Judge John M. Ferren.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CV-59

DARRELL JOHNSON, *et al*., APPELLANTS,

v.

DISTRICT OF COLUMBIA, APPELLEE.

FILED 8/11/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CAB-4227-13)

(Hon. Maurice A. Ross, Trial Judge)

(Argued February 17, 2016                    Decided August 11, 2016)

*Juan C. Estevez*, of the bar of the State of Virginia, *pro hac vice*, by special leave of court, with whom *Kyle L. Epting* was on the brief, for appellants.

*Carl J. Schifferle*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General, were on the brief, for appellee.

Before FISHER and BECKWITH, *Associate Judges*, and FERREN, *Senior Judge*.

FERREN, *Senior Judge*:  On June 21, 2013, the District of Columbia filed a "false claims" action against the Washington East of the River Academy of Entrepreneurship, Arts, Life Skills, Technology and Health for "Youth on the Rise" (WEALTHY), a nonprofit corporation.  Also named as defendants were

WEALTHY's principals, Diana Robinson, Darrell Johnson, and Johnson's company, National Tax Pro, LLC (National Tax Pro). The complaint claimed (1) violations of the District of Columbia False Claims Act, D.C. Code § 2-381.02 (a)(2) (2013), and (2) unjust enrichment – both derived from allegedly paying excess compensation to Robinson and Johnson (including his company) from a $400,000 grant by the District to WEALTHY for provision of youth services during fiscal year 2009.

The District moved for summary judgment, which was granted on June 30, 2014, against, Robinson, Johnson, and National Tax Pro, followed by a final judgment entered on August 12. Without elaboration, the trial court held them liable, jointly and severally, for treble damages of $931,200 for violations of the False Claims Act. The court also found Robinson liable for $91,100, and Johnson and National Tax Pro liable for $31,973, for unjust enrichment. The District then moved for a default judgment against WEALTHY, which was granted on December 18, 2014, holding WEALTHY liable, jointly and severally with the other defendants, for $931,200 under the False Claims Act while adding that "the District may collect no more than a total of $931,200 from all the Defendants in this action."

Only Johnson and National Tax Pro have filed an appeal. We affirm the False Claims Act judgment but remand the case for recalculation of treble damages. We vacate the duplicative judgment for unjust enrichment.

## I. The Grant Agreement

Diana Robinson was the executive director of WEALTHY and the president of its three-member board of directors. Darrell Johnson served as the treasurer and a non-voting member of the board. Johnson was also WEALTHY's accountant, doing business as National Tax Pro.[1] WEALTHY's "Work Plan" provided the following description of the summer youth program to be administered under the grant:

> "[WEALTHY] is a Rites of Passage program of substance abuse prevention, teen pregnancy prevention, juvenile crime prevention and HIV/AIDS prevention education. This program of prevention and education will concentrate on Ward Eight youth between the ages of 14 and 18 [*sic*: 21], using evidence-based best practices of a developed curriculum by which this

---

[1] Hereafter, because Johnson and National Tax Pro are alter egos on this record, we simplify by referring to both most of the time as "Johnson," although occasionally to "Johnson and his company" or "Johnson's company."

population will be recruited and trained in a continuum of care that reduces the number of Ward Eight youth and adolescents entering into the juvenile justice system. Activities included in the program include a 200 voice mass choir, a 50 member marching percussion band, a 50 member step team, a 50 member dance troupe, a drama ensemble, classes in martial arts, computer technology, visual, graphic and media arts, a Parenting Academy, and, a Young Executive Leadership Institute."

The Council's $400,000 grant was actually given to the Children and Youth Investment Trust Corporation (the Trust), a non-profit organization governed by a board appointed by the Mayor and the Council,[2] for distribution to WEALTHY. In order to obtain the grant, WEALTHY was required to submit to the Trust a detailed budget setting forth how the funds would be spent. Johnson and Robinson created a budget and "budget narrative," which the Trust approved, for $388,000. (The Trust withheld 3% or $12,000 of the $400,000 grant for administrative costs.) The budget and its narrative envisioned compensation for personnel (with fringe benefits) totaling $289,764 for twelve salaried individuals plus a financial "consultant," collectively amounting to six working full time, plus additional "consultants" to direct children's activities. For all these positions, the following

---

[2] *See* Children and Youth Initiative Establishment Act of 1999, D.C. Law 13-38, § 2404(2)(A), 46 D.C. Reg. 6373, 6408 (1999), D.C. Code § 2-1553 (2015).

amounts were budgeted for "Salaries & Wages" and "Consultants & Professional Fees":

| Salaries & Wages | |
|---|---|
| Management | $90,400 |
| *1) Project director: 60% time for 12 mos. @ $84,000 = $50,400* | |
| *2) Project manager: 100% time for 12 mos. @ $40,000 = $40,000* | |
| Teacher/Instructors | $50,000 |
| *3 & 4) Two educators 50% time for 12 mos. @ $25,000 each* | |
| Professionals | $25,000 |
| *5 & 6) Two instructor/counselors 50% time for 12 mos. @ $12,500 each* | |
| Aides/Assistants | $25,000 |
| *7, 8, 9 & 10) Four aides 25% time for 12 mos. @ $6,250 each* | |
| Clerical | $15,000 |
| *11 & 12) Two administrative aides 50% time for 12 mos. @ $7,500* | |
| **SUBTOTAL** | **$205,400** |
| Fringe Benefits @ 16% of total salaries | $32,864 |
| | |
| **Consultants & Professional Fees** | |
| Services to children: choral, music, dance instruction | $10,000 |
| Services to children: life skills, intervention lectures/activities | $17,500 |

| | |
|---|---|
| Financial Mgmt, payroll services and reporting @ $3,000 per mo.[3] | $24,000 |
| **SUBTOTAL** | **$51,500** |
| **TOTAL** | **$289,764** |

The grant agreement between the Trust and WEALTHY, entered on November 19, 2008, covered the twelve-month period from October 1, 2008, to September 30, 2009.[4]  Pursuant to that agreement, WEALTHY was to provide specified programming. Any modification of the resulting Work Plan required submission to the Trust, and its approval.  Moreover, WEALTHY could "only use the Grant Amount as described in the budget approved by the Trust. . . .  Any deviation from budget line-items in excess of 10% or $2,000, whichever is greater," had to be "submitted in writing to the Trust for approval."  The agreement further required WEALTHY to submit monthly expenditure reports on a specified

---

[3]  The budget does not estimate the percentage of a consultant's time for Financial Management, etc.  After review of the record, we conclude that a reasonable assumption is 40% time for eight months for appellant Johnson (including National Tax Pro).

[4]  The agreement was amended on May 8, 2009, without substantive changes relevant here, to substitute Training Grounds, Inc., for Parklands Community Center as WEALTHY's fiscal agent to receive the grant funds because WEALTHY was not a tax exempt organization under § 501 (c) of the Internal Revenue Code.

form listing "all expenditures for the calendar month," including costs incurred even if WEALTHY had not yet made payment.

## II. The Issue

The question presented is whether appellants violated the District's False Claims Act by knowingly making or using false and material records or statements (WEALTHY's monthly expenditure reports) to claim and take excessive compensation from WEALTHY, a grantee of District funds intended to benefit District youth and adolescents.

## III. The False Claims Act

We begin with the statute. The District of Columbia False Claims Act imposes liability "for 3 times the amount of damages which the District sustains because of the act of [a] person" who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."[5]

---

[5] D.C. Code § 2-381.02 (a)(2) (2016 Supp.).

A "claim" is "[a]ny request or demand, whether under a contract or otherwise, for money or property . . . that . . . [i]s presented to . . . the District[] or [i]s made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the District's behalf or to advance a District program or interest, and if the District . . . has provided any portion of the money or property requested or demanded."[6] As elaborated below, under the case law a claim can be "factually false" or "impliedly false."[7]

The word "knowingly" in the statute means that the person "[h]as actual knowledge of the information; [a]cts in deliberate ignorance of the truth or falsity of the information; or [a]cts in reckless disregard of the truth or falsity of the information."[8] Thus, "knowingly" does "not require proof of specific intent to defraud."[9] Finally, a false record or statement is "material" if it has "a natural

---

[6] D.C. Code § 2-381.01 (1)(A).

[7] See Part VI. A. below.

[8] D.C. Code § 2-381.01 (7)(A).

[9] D.C. Code § 2-381.01 (7)(B).

tendency to influence, or [is] capable of influencing, the payment or receipt of money or property,"[10] an issue commonly of determinative importance.

## IV. Standard of Review

"The question whether summary judgment was properly granted is one of law, and we review *de novo*. For a party to be entitled to summary judgment, that party must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Independently assessing the record, we view it in the light most favorable to the party opposing the motion."[11] "Once the moving party makes the requisite initial showing, the burden shifts to the non-moving party to come forward with specific evidence showing, to the contrary, that genuine issues of material fact do exist."[12] The non-moving party "may not rest

---

[10] D.C. Code § 2-381.01 (8). According to a footnote in the District's brief, "[t]he version of the Act in effect at the time of the false claims alleged did not have an express materiality requirement, *see* D.C. Code § 2-381.02 (2011 Repl.), but the District will assume for purposes of this appeal that materiality was required."

[11] *William J. Davis, Inc. v. The Tuxedo LLC*, 124 A.3d 612, 617 (D.C. 2015) (citations and internal quotation marks omitted).

(continued . . .)

upon the mere allegations or denials of [its] pleading," but must submit, by affidavits or other evidence, "specific facts showing that there is a genuine issue for trial."[13] "While [the court] examine[s] the evidence in the light most favorable to the party opposing the motion, conclusory allegations by the nonmoving party are insufficient to establish a genuine issue of material fact or to defeat the entry of summary judgment."[14]

## V. The Grant Agreement As Administered

### A. Distortion of the Work Plan

It would appear from the grant agreement that WEALTHY itself was to develop and administer the Work Plan. It did not do so. Appellants do not dispute the District's "Statement of Material Undisputed Facts," ¶ 127-28, which stresses

_____
(. . . continued)
   [12] *Wallace v. Eckert, Seamans, Cherin & Mellott, LLC*, 57 A.3d 943, 949 (D.C. 2012) (citation and internal quotation marks omitted).

   [13] Super. Ct. Civ. R. 56 (e).

   [14] *Hamilton v. Howard Univ.*, 960 A.2d 308, 313 (D.C. 2008) (citation and internal quotation marks omitted).

that "WEALTHY's actual activities were limited to an 8-week summer program in 2009[,] . . . assisting in summer camps offered by three other non-profit organizations: HICKS [Helping Inner City Kids Succeed], Wingate Towers & Garden [Apartments], . . . and Training Grounds," plus, according to Robinson on deposition, "maybe a little bit of money in something else." When asked on deposition whether all three organizations were financed for the purpose of assisting with the D.C. Department of Education's Summer Youth Employment Program (SYEP) – a program not included in the Work Plan – Robinson replied, "That's exactly right." And Johnson confirmed that Training Grounds, for example, had received $25,000 from WEALTHY for use, according to Robinson, in a basketball and computer program for "older youth" – an activity not included in the Work Plan. HICKS received another $15,000, presumably for SYEP and for funding portions of the HICKS' summer camp. At Wingate, rather than pay a lump sum, WEALTHY paid directly for classes in cooking, jewelry-making, and music and art instruction, as well as bus transportation for field trips – all for children aged 6-12 (younger than the children and youth, aged 14-21, to be served in the Work Plan).

Robinson confirmed during her deposition that WEALTHY never modified the Work Plan as the grant agreement required for deviations. Johnson's

deposition does show, however, that although he "might have requested" a modification of WEALTHY's budget, the July 2009 deadline had passed and the Trust in any event had refused. Accordingly, WEALTHY functioned in fiscal 2009 with a disconnect: an informally modified Work Plan financed by the original, unmodified budget – a disconnect that, as we shall see, facilitated the false claims alleged here.

## B. The Monthly Reports

We begin by noting that the alleged falsity is derived from (1) WEALTHY's monthly expenditure reports to the Trust and (2) WEALTHY's corresponding year-to-date compilations of monthly invoices submitted to the Trust, when compared with (3) WEALTHY's General Ledger and (4) payroll checks, both detailing the actual payments made. The first two sets of documents report monthly, and cumulatively, the expenses charged against line items in the various categories of WEALTHY's budget. The second two sets identify the individual payees of funds expended under the budget line items.

The District argues that Johnson had sole responsibility for creating and maintaining WEALTHY's financial records, and that he prepared monthly

expenditure reports which falsely claimed authorized compensation for Robinson and himself. He allegedly did so by underreporting compensations in the monthly line-items for "Management" and "Professional Services" ("Accounting" and "Audit")[15] – understood, without dispute, to cover Robinson and Johnson, respectively – while hiding the excess in each instance as another type of expenditure, thereby understating their total compensations while overstating other expenditures in WEALTHY's budget.

Appellants, on the other hand, allege a flaw in the government's premise that Robinson and Johnson were compensated (excessively so) only for management and accounting. To the contrary, say appellants, amounts that the government calls excessive compensation were properly chargeable to accounts for other areas of WEALTHY's operations, because Robinson and Johnson worked in diverse activities for WEALTHY, not just in the management and accounting roles identified by the government.

---

[15] "Professional Services" in the monthly reports are taken from the "Accounting" and "Audit" line items (plus one $2,000 line item for "Other") in WEALTHY's General Ledger. Hereafter, all references to budget "categories" or "line items" for personnel can be checked by inspecting the budget chart above in Part I.

We address this controversy, first, by showing the line items of the monthly reports at issue: "Management" for Robinson and "Professional Services" for Johnson, as well as the actual payments each received month by month.

| Month | Robinson (actual payments) | Reported for "Management" | Johnson (actual payments) | Reported for "Professional Services" |
|---|---|---|---|---|
| Oct-08 | $0 | $7,000 | $2,000 | $0 |
| Nov-08 | $0 | $7,000 | $0 | $0 |
| Dec-08 | $30,000 | $7,000 | $11,000 | $0 |
| Jan-09 | $0 | $7,000 | $0 | $0 |
| Feb-09 | $0 | $4,100 | $0 | $1,500 |
| Mar-09 | $0 | $4,100 | $0 | $3,725 |
| Apr-09 | $0 | $0 | $0 | $0 |
| May-09 | $30,000 | $30,000 | $9,000 | $17,000 |
| Jun-09 | $0 | $10,000 | $5,000 | $11,000 |
| Jul-09 | $0 | $8,000 | $10,150 | $0 |
| Aug-09 | $61,500 | $6,200 | $7,548 | $0 |
| Sep-09 | $20,000 | (no report) | $3,000 | (no report) |
| Oct-09 | | (no report) | $2,500 | (no report) |
| Jan-10 | | (no report) | $10,000 | (no report) |
| May-10 | | (no report) | $1,000 | (no report) |
| Jul-10 | | (no report) | $4,000 | (no report) |
| TOTAL | [16]$141,500 | $90,400 | [17]$65,198 | $33,225 |

Johnson submitted eleven monthly reports with twenty-two entries from October 2008 through August 2009, detailing WEALTHY's expenditures to

---

[16] Actual payments are taken from WEALTHY's "General Ledger."

[17] Actual payments are reflected in fourteen checks of record and in WEALTHY's "General Ledger."

implement the Work Plan. Each report reflecting compensation for Robinson listed her payments under "Management" (a line item in the report under "Salaries & Wages"). Each report reflecting compensation for Johnson (National Tax Pro) listed payments under "Professional Services" (a line item of the report under "Consultants/Professional fees"). Each of these entries for Johnson and his company, however, was derived from subordinate line items, representing narrower financial categories, in WEALTHY's General Ledger. These line items were for "Professional Fees" of three kinds: "Accounting,"[18] "Audit," and a single, unspecified entry of $2,000 for "Other." In sum, all funds (except $2,000 reported monthly for Johnson) were allocable solely to financial work.

As demonstrated in the table above, WEALTHY's actual payments to Robinson and Johnson – as taken from WEALTHY's General Ledger (and, as to Johnson, confirmed by copies of paychecks) – were different from the payments reported in seventeen of the twenty-two entries in the monthly reports (the boxes in gray indicate the five consistent statements). Because of accrual accounting,

---

[18] See *supra* note 15. The memo lines in the General Ledger call these entries "Financial Mgmt and IT Services," as well as "tax returns" and "[Department of Employment Services] forms." These memo entries more accurately reflect the line item language in WEALTHY's budget – "Financial Mgmt, Payroll Services and Reporting" – under "Consultants & Professional Fees." See the budget categories in Part I. above.

however – including, perhaps, "advance payments" authorized by the grant agreement – these differences are not necessarily meaningful. But whatever numbers (including "0") may be accurate, general accounting theory does not excuse the filing of a report altogether, and the table here shows that one payment was made to Robinson and five were made to Johnson without the required reports (a failure, as we shall see, that adds heft to the District's argument).

Neither the monthly reports nor WEALTHY's year-to-date compilations of monthly invoices indicate particular activities underlying Robinson's and Johnson's compensation ($141,500 and $65,198, respectively), but those reports and compilations can be expected to make clear all distinctive budgetary categories for that compensation (management, financial, teaching, clerical, etc.). Appellants argue that not all the sources of Robinson's and Johnson's compensation must be discernible from the line items reported each month because, they stress, the "[l]ine items in the Budget reflect amounts allocated for types of services rather than [for] specific individuals or entities," and that Robinson and Johnson legitimately performed services outside the line items for management and accounting admittedly allocable to them. As we shall see, the record does not support appellants' contention.

## C. Robinson

As to Robinson, WEALTHY's monthly reports over the period from October 2008 through August 2009 indicated that exactly $90,400, the correct amount budgeted for 1.6 full-time jobs, had been reported for "Management," a budget line item obviously intended for Robinson.[19] In August 2009, however, Robinson actually received $61,500 – $55,300 more than the $6,200 reported for that month. And in September, the last month of fiscal 2009, she received another $20,000 unsupported by any monthly report, for a grand total of $141,500 – $51,100 more than the $90,400 budgeted and reported for "Management."

As the source for Robinson's additional income, Johnson, in response to plaintiff's interrogatories, cited "Teacher/Instructors," a line item of the budget under "Salaries & Wages" (calling for two half-time employees). That entry would add $50,000 to her "Management" salary of $90,400 and bring her close to

---

[19] The budget line item for "Management" specifies two employees: a "Project director" working part-time (60%) for $50,400, and a "Project manager" working full-time for $40,000. The District implies, without expressly arguing, that Robinson therefore took too much "management" compensation for one person. Perhaps so, but because the monthly reports disclosed that Robinson took the full $90,400 budgeted for "Management," no false claim can be attributed to her taking that amount.

the $141,500 she received. In the General Ledger, however, "Teacher/Instructor" shows nothing for Robinson; her entire $141,000 (including her "Management" salary) can be found in the nondescript category "Compensation − Other."[20] The record makes clear, moreover, that Robinson's contribution to WEALTHY was almost exclusively managerial; it was no more than *de minimis* educational. Her teaching did not extend beyond a one-time, half-day class in kite-making at Wingate. Robinson's overall compensation, therefore – $141,500 – equaled slightly more than the budget for 2.6 full-time jobs, without the required evidentiary support.

**D. Johnson**

We turn to Johnson. For the period October 2008 through May 2009, the monthly reports show $22,225 for "Professional Services," traceable in the General Ledger to "Professional Fees" for "Accounting" and "Audit,"[21] with actual payments totaling $22,000 to Johnson (including National Tax Pro). By the end of

---

[20] The General Ledger shows a "management" category which is blank. The year-to-date compilation of monthly invoices, however, attributes the accumulation of Robinson's payments to "management."

[21] See *supra* note 15 and text accompanying *supra* note 18.

June 2009, however, Johnson had exceeded the overage allowed for the $24,000 budget for "Financial Management" fees (the greater of 10% or $2,000); he had cumulatively received $27,000 in actual payments based on monthly reports showing that he had received even more: $33,225 (see table above). Two months later, by the end of August 2009, he had received an additional $17,698 without the backing of monthly reports, and at the end of July 2010, Johnson had received for fiscal 2009 a total of $65,198 without further documentation by monthly reports.[22]

Johnson's claimed sources of $41,198 in compensation beyond $24,000 are obscure. First, appellants allege "some evidence" that Johnson and his company undertook compensable services in addition to accounting, citing "computer-related services," "tax return preparation," "audit support," and maintenance of WEALTHY's "financial records," as well as Johnson's service "as WEALTHY's treasurer and non-voting member of [its] [B]oard of [D]irectors." Other than service as an officer and board member, however, for which no time commitment or dollar value has been proffered, these activities are unquestionably embraced by, and thus limited to, the $24,000 budget category for "Financial Management," as

---

[22] Appellants do not dispute that Johnson's payments over the period October through July 2010 are attributable to fiscal 2009.

the General Ledger confirms.[23]  We see no sound basis for concluding that, in the absence of a budget modification, Johnson and his company were entitled to additional compensation for these financial activities.

Second, appellants argue more vigorously that Johnson and his company were not limited to compensation for financial work, because the budget contains "a whole host of other categories" from which their compensation could have been drawn, "including 'Clerical' and 'Aides/Assistants'" and, presumably, "Professionals"[24] – all budget subcategories under "Salaries & Wages" (not under "Consultants & Professionals," which covers Johnson's "Financial Mgmt" role). This argument is unconvincing.  When put together with the first argument, appellants are either saying that (1) if their financial work beyond "accounting" was not covered by the $24,000 budget for Financial Management, that financial work could have been compensated from funds for other, non-financial budget

---

[23]  See *supra* note 17.

[24]  As a source of funds for Johnson and National Tax Pro, appellants did not include "Professionals" when referring in their brief to "Aides/Assistants" and "Clerical," perhaps because "Professionals" in this line item are expressly limited to "instructor/counselors," which does not in any way describe the role of Johnson, who testified on deposition that he "had no direct involvement with the actual activities that WEALTHY was putting on for youth."  Nonetheless, because appellants used the word "including," we give them the benefit of the doubt and count "Professionals" among the "whole host" of line items claimed to cover Johnson and his company.

categories; or they are arguing – contrary to the first contention − that (2) Johnson actually was doing compensable non-financial work worth $41,198 beyond the $24,000 financial service he provided.

The first contention is plainly wrong; according to the grant agreement, funds budgeted for one function cannot (aside from the $2,000 or 10% overage factor) be applied to another function, absent Work Plan and budget modifications. The second contention, abandoning appellants' first factual premise, presupposes some kind of reliable documentation that Johnson and his company actually were involved in program activities – contrary to Johnson's deposition testimony that he "had no direct involvement"[25] in WEALTHY's youth activities.

The contention that Johnson may have been engaged in compensable non-financial program activities is conclusively refuted by the General Ledger entries documenting that, but for a $2,000 budget item designated "Other," *all* of Johnson's (and National Tax Pro's) $65,198 compensation was for financial services: "Accounting" and "Audit," two subcategories of "Professional Fees."[26]

---

[25] See *supra* note 24.

[26] See *supra* note 18 and accompanying text.

More specifically, WEALTHY's General Ledger shows no compensation in fiscal 2009 for Johnson or his company in any of the non-financial line items corresponding to appellants' proffers: "Aides, assistants, and interns," or "Clerical and Other Stipends," or "Other Professionals."[27] Nor have we been able to find Johnson's additional compensation in any other non-financial line item in the General Ledger. Accordingly, Johnson's financial work was his only contribution to WEALTHY (aside from responsibilities as a Board member).

If Johnson's financial work required more than the $24,000 budgeted for it, we expect that Johnson would have timely sought a budget modification, as required under the grant agreement. Not having done so, however, Johnson is left to argue (as noted above) that his additional $41,198 came from the $65,000 budgeted for "Aides/Assistants" ($25,000), "Clerical" ($15,000), and

---

[27] Appellants do not argue that Johnson or his company received compensation from the line items under Consultants & Professional Fees for "services to children," namely, "choral, music, dance instruction" and "life skills, intervention lectures/activities." Clearly, these items were budgeted for children's activities in which Johnson eschewed participation.

For the first time on appeal, however, in the reply brief, appellants argue that other budget categories "could have been" (not "were") used for paying Johnson (including National Tax Pro), such as those for "Telecommunications" and "Computer Equipment." If so, these categories were clearly outside the scope of the funds budgeted for personnel. In any event, WEALTHY's General Ledger reveals no payments to Johnson or National Tax Pro from these categories.

"Professionals" ($25,000).[28]  Depending on the sources for the $41,198, this means

that Johnson himself would have handled his own part-time (40%) financial work

for $24,000, and also taken funds otherwise required to pay four to six part-time

workers employed to cover as many as two full-time positions ($25,000 plus

$15,000) – with total compensation equal to  2.4 full-time staff members.


In sum, when Johnson's compensation of $65,198 is added to Robinson's

$141,500, representing 2.4 and 2.6 full time staff members, respectively, we find

that these two individuals have taken compensation allocable to five of the six full-

time budgeted staff positions, leaving open no more than two or four part-time

employee positions (depending on how Johnson's $41,198 was allocated between

"Professionals" and "Aides/Assistants").[29]

---

[28]  See budget categories in Part I. above.  The corresponding categories in the monthly reports are:  "Aides, assistants, interns," "Clerical and other staff," and "Other education and service professionals."

[29]  If, alternatively, some of Johnson's overage had come from the $27,500 line item for "services to children," see *supra* note 27, rather than from "Professionals" or "Aides/Assistants," that would have freed up funds for two or four part-time employees but would have decimated the budget for "Consultants." Because Johnson proffered the names of 14 individuals hired as employees, contractors, or consultants for WEALTHY, and further because Johnson himself did not interact with children, see *supra* note 24, it is highly unlikely that funds for "services to children" were used to compensate Johnson.

(continued . . .)

**E. Demise of the Budgeted Work Plan**

Self-evidently, appellants' proffered explanation of Robinson's and Johnson's total compensation distorted any promise that the Work Plan could have been accomplished as intended. Indeed, the record reveals the virtual demise of WEALTHY's Work Plan, which specified ten activities with hundreds of participants. As acknowledged by Johnson on deposition, the plan presupposed that activities would occur simultaneously at different locations, and thus would require several categories of personnel working at the same time – without doubt more than Robinson and Johnson could have provided with a substantially reduced

_____

(. . . continued)

As a postscript on allocation of Robinson's $51,100 and Johnson's $41,198 in excess compensation (totaling $92,298), we have assumed Robinson's proffer of "Teacher/Instructors" ($50,000) and Johnson's proffers of "Aides/Assistants" ($25,000), "Clerical" ($15,000), and "Professionals" ($25,000) as the sources of these excess amounts. The final compilation of WEALTHY's monthly invoices shows that the total of these proffered amounts ($115,000) was spent in fiscal 2009 in the amount each category was budgeted – except for two: $38,897 was spent (under budget) for "Teacher/Instructors" and $36,103 (over budget) for "Professionals," equaling the budgeted total amount of $75,000 for the two. These final expenditures do not alter our analysis; they would only require fine-tuning of the amounts from each category which Robinson and Johnson had taken for their respective excess draws.

cadre of part-time employees and consultants.[30]   This evidence, therefore – substitution of enhanced compensation for Robinson and Johnson in lieu of hiring personnel essential to the Work Plan – substantially demonstrates why, for the 2009 fiscal year, Robinson and Johnson funded three other non-profit organizations rather than attempt to implement fully the Work Plan prescribed by the grant agreement that WEALTHY had submitted to the Trust.

Still other evidence demonstrates that neither Robinson nor Johnson implemented the youth programs described in WEALTHY's Work Plan.  While it is true that Robinson had minor involvement with the non-profit organizations WEALTHY funded in lieu of the intended plan, Robinson's deposition reveals that she "did not personally . . . teach" any class for youth at HICKS; she was "like a program manager" at Training Grounds and Wingate; and although she taught a one-time half-day Kites for Peace class at Wingate, she only observed the art and music classes there.  Thus, her visits to Wingate, described by its Director of Resident Services as "roughly three times each week" for "a few minutes to four hours," were in a managerial, not educational, capacity.  For his part, Johnson

---

[30]   There is no record evidence that WEALTHY had program funds during fiscal 2009 other than those provided by the District under the grant agreement at issue here.  Moreover, during his deposition, Johnson testified that WEALTHY had no "grant funding source" after September 30, 2009, the end of the fiscal year at issue here.

testified on deposition: "generally speaking I don't get involved – I'm not a part of the organizations that I operate as an accountant."

Based on all the evidence, therefore, we confront the question whether Robinson and Johnson, in lieu of implementing WEALTHY's Work Plan as required under the grant agreement, submitted "false claims" in violation of District law, in order to take for themselves substantial funds which had been earmarked for achieving that plan to benefit District children and youth.

## VI. The False Claims Act As Applied

### A. False or Fraudulent Claim

The District's False Claims Act was derived from California's statute, which in turn was based on the federal False Claims Act.[31] We have said, accordingly, that "it is appropriate to turn to both California and federal cases for guidance."[32] Federal decisions, however, have not been uniform over the years and offer a

---

[31] *Grayson v. AT&T Corp.*, 980 A.2d 1137, 1146 n.25 (D.C. 2009), *vacated en banc*, 989 A.2d 709 (D.C. 2010).

[32] *Id.*

variety of approaches to discerning what a "false claim" is. A claim has been called "factually" false when a contractor has sought reimbursement without providing the product or service agreed upon.[33] When, however, a contractor provided the required product or service but failed to comply with a condition of payment imposed by statute, regulation, or contract, the courts have called the claim "legally" or "impliedly" false.[34] Moreover, two species of impliedly false claims have been identified: those in which the contract "expressly" required the contractor to certify such compliance as a condition of payment,[35] and others in which the contract merely "implied" the obligation to satisfy compliance.[36]

---

[33] *See United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) (a claim is factually false when it "'involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided'" (quoting *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001) *(Mikes)*; *accord, United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1168 (10th Cir. 2010) (same); *see also United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011) *(Wilkins)* ("A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government.").

[34] *See Sci. Applications Int'l Corp.*, 626 F.3d at 1266 (claim for payment is false "when it rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term"); *see also Wilkins*, 659 F.3d at 306 ("[A] majority of [courts of appeal] . . . have recognized that there can be implied false certification liability under the FCA.").

[35] *Wilkins* at 307; *Mikes*, 274 F.3d at 700.

(continued . . .)

In this case, the question whether the District has alleged a "factually" or "impliedly" false claim – a distinction the District never discusses – has become irrelevant because the District has covered both bases. In its complaint, the District claimed that "WEALTHY falsely reported that the grant funds were being spent in accordance with [its] earmark budget," and thereby "wrongfully obtained a total of $310,400 in grant funds that the Trust paid in reliance on the [false] reports." This is both a "factually" false claim, alleging that appellants took money "for goods or services never provided,"[37] and an "impliedly" false claim, alleging appellants' "false representation of compliance with an applicable . . . contractual term,"[38] WEALTHY's "earmark budget." Whatever the preferred characterization (if any) may be, the distinction would have no meaning here, for two reasons. First, a false claim of one kind or another has unquestionably been alleged with proffered evidentiary support. Second, as we shall see, the distinction would not affect the result after application of the other statutory criteria, namely, that any

_____

(. . . continued)

[36] *Sci. Applications Int'l Corp.*, 626 F.3d at 1268-69; *United States ex rel. Ebeid, M.D. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).

[37] *Sci. Applications Int'l Corp.*, 626 F.3d at 1266.

[38] *Id.*

allegedly "false record or statement" must be "knowingly" made and "material to [the] false or fraudulent claim."[39] We therefore turn to these other criteria.

## B. False Record or Statement

As noted earlier, the respective amounts reported and paid in any month will not necessarily be the same either because of accrual accounting or WEALTHY's authority under the grant agreement to make "advance payments" of various sorts. Thus, we do not necessarily find falsity in the mere fact that the amount reported for a month differed from the amount paid. As of the end of the fiscal year, of course, the total of the reported amounts and total expenditures corresponding to those reports should be equal.

The compilation of WEALTHY's monthly invoices as of the end of the year accomplished that equalization here; the total "allocation" of grant funds and the total of the amounts reflected in the monthly reports equaled $388,000. Thus, any assuredly actionable "false record or statement"[40] will have occurred, if at all,

---

[39] D.C. Code § 2-381.02 (a)(2).
[40] D.C. Code § 2-381.02 (a)(2).

starting when the actual payments began, irretrievably, to diverge from the monthly reports and the budget allocations, clearly showing excess compensation: in August 2009 for Robinson, June 2009 for Johnson.

Ordinarily, the trial court grants summary judgment only after making its own detailed findings of fact and conclusions of law. The court did not do so here, ruling summarily instead. We need not remand for trial court findings and conclusions, however, because, in reviewing a summary judgment, this court, like the trial court, assesses only a written record uninfluenced by subjective impressions gained from witnesses at a trial.[41] Accordingly, after completing our *de novo* review, we are satisfied by the foregoing analysis of WEALTHY's grant, as administered, that the District, as plaintiff, has made the required initial showing that there is no genuine issue of material fact, and that appellants have not carried their burden of coming forward with evidence sufficient to show that factual issues exist.[42] Our conclusions of law are derived from the following findings of fact from the record – either admitted or ineluctably established:

---

[41] *Kotsch v. District of Columbia*, 924 A.2d 1040, 1044 (D.C. 2007) (when reviewing summary judgment, court of appeals conducts independent review of record).

[42] See our standard of review above in Part IV.

*First*, WEALTHY's summer program was substantially different from the Work Plan envisioned under the grant agreement. Robinson and Johnson essentially subcontracted WEALTHY's activities to three other non-profit organizations for youth, permitting WEALTHY to hire fewer staff members. This reduction of staff freed up funds for additional compensation to Robinson and Johnson – funds that otherwise would have been required to hire other employees and consultants to cover summer activities in several locations, simultaneously, under the intended Work Plan.

*Second*, as evidence in support of the first finding, the line item in WEALTHY's budget for "Management," granting Robinson compensation for 1.6 full time management jobs, was $90,400. That left an additional $51,100 which was paid to her, according to appellants, from the $50,000 budgeted for two half-time "Teacher/Instructors." This line item represents a full-time endeavor that Robinson did not undertake; the General Ledger and year-to-date compilation of monthly invoices show that all of Robinson's compensation was attributable to "management" (see *supra* note 20 and accompanying text). Through this diversion of funds from teaching, Robinson was compensated altogether for 2.6 full-time jobs.

*Third,* Johnson's contribution was exclusively financial management, namely, accounting and related services; he expressly acknowledged no participation in WEALTHY's program activities. Nonetheless, the addition of $41,198 for compensation beyond the $24,000 budgeted for "Financial Management" (an estimated 40% part time job) brought his total compensation to $65,198. To justify this total, Johnson proffered receipt of payments equivalent to more than two full-time jobs ($25,000 from the line item either for "Professionals" or for "Aides/Assistants" and $15,000 from "Clerical") without a corresponding proffer of service to WEALTHY outside his financial responsibilities (aside from Board membership). The General Ledger confirms that Johnson thus diverted to his financial work over $40,000 in funds budgeted for program activities, achieving compensation for 2.4 full-time jobs.

*Fourth*, Johnson (a) provided eleven monthly financial reports "signed and encrypted" by Robinson; (b) omitted a required report for the last month (September) of fiscal 2009 in which Robinson received $20,000 and Johnson received $3,000; and (c) omitted reports for compensation to Johnson (and his company), allocable to fiscal 2009, totaling an additional $17,500 between October 2009 and July 2010.

*Fifth,* given appellants' failure to document Robinson's receipt of $50,000 as a "Teacher/Instructor," as proffered, we find that the payments Robinson received during the last two months of fiscal 2009 – $61,500 in August and $20,000 in September, were accounted for only to the extent of $30,400 (the amount, when coupled with $60,000 paid earlier, that achieved her budgeted $90,400).

*Sixth*, the $81,500 that Robinson received in August and September 2009 (see *Fifth* finding), was assembled from $61,500 based on an August monthly report of only $6,200, and the other $20,000 was based on no monthly report at all. These two payments cannot be reconciled with accrual accounting beyond $30,400 paid in August. Therefore, the additional $51,100 remains unaccounted for.

*Seventh*, the $20,500 in compensation that Johnson received during September 2009 through July 2010 (see *Fourth* finding) is not documented in required reports and thus is unaccounted for.

*Eighth,* Robinson and Johnson together took as compensation $206,698 (exclusive of fringe benefits), amounting to 80.5% of WEALTHY's $256,900 personnel budget (exclusive of fringe benefits) or 53.3% of WEALTHY's entire $388,000 budget for fiscal 2009, all of which was spent, as reflected in WEALTHY's compilation of monthly invoices for fiscal year 2009. As a result, Robinson and Johnson took funds for themselves budgeted for the work of five of the six full-time staff positions (see *Second* and *Third* findings) – positions intended to be filled not only by Robinson ($90,400) and Johnson ($24,000) but also by six to eight of the ten budgeted part-time employees (about $90,000) working simultaneously, in several locations, under the Work Plan.

*Ninth,* by taking compensation otherwise budgeted for six to eight part-time employees, Robinson and Johnson prevented WEALTHY from carrying out the Work Plan, as written, and took funds that should have been retained by WEALTHY unless the Work Plan and budget were properly modified pursuant to the grant agreement (which they were not).

*Tenth,* Robinson's and Johnson's failure to seek modification of the Work Plan and budget to justify WEALTHY's grants to the three non-profit organizations is indirect but probative evidence of an intention not to conserve

WEALTHY's funds when the Work Plan as such, for whatever reason, would not be implemented, and thus to take additional, unbudgeted compensation of $92,298 for themselves.

At the heart of this case, therefore, are four basic, unassailable conclusions of law:

(1) WEALTHY, directed by Robinson and Johnson, entered into an agreement to receive funding from the District of Columbia through WEALTHY and the Trust, in order to perform services for the District's youth according to a specific Work Plan and related budget.

(2) Based on the evidence presented, WEALTHY, and thus Robinson and Johnson, failed to carry out these agreed-upon services, instead using over half the expended $388,000 in grant funds ($206,698 or 53.3%) to compensate Robinson and Johnson for a substantial measure of Work Plan activities which they assuredly did not undertake.

(3) Absent a modification of WEALTHY's Work Plan and budget, Robinson and Johnson were not entitled to compensation above the $90,400 and $24,000

allocable to them, respectively, under the budget for "Management" and "Financial Mgmt, payroll services and reporting" in the grant agreement. Accordingly, they took $92,298 from WEALTHY in excess compensation ($206,698 minus $114,400 equals $92,298).

(4) The monthly reports prepared by Johnson and "signed and encrypted" by Robinson omitted the required report for the last month (September) of fiscal 2009 in which Robinson received $20,000 and Johnson received $3,000. They also omitted required reports of compensation paid to Johnson, allocable to fiscal 2009, totaling $17,500 between October 2009 and July 2010. As a result, the compilation of required monthly reports for which Johnson and Robinson were responsible – and which they defaulted, in part, in preparing – falsely stated the total compensation that Robinson and Johnson each received: $90,400 for Robinson instead of $141,500 and $33,225 for Johnson instead of $65,198. The result, as noted in conclusion (3), was a "false or fraudulent claim" of $92,298 in compensation over budget, underreported by $83,073.[43]

_____

[43] Unlike the cumulative monthly reports that limited Robinson's compensation to the budgeted $90,400, the reports acknowledged payment of $33,225 to Johnson, which was $9,225 over the $24,000 budgeted. Thus, the

(continued . . .)

## C. Knowingly

As noted earlier, the District's False Claims Act imposes liability on anyone who "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."[44]  The Act defines "knowingly" as having "actual knowledge of the information; [a]ct[ing] in deliberate ignorance of the truth or falsity of the information; or [a]ct[ing] in reckless disregard of the truth or falsity of the information."[45]

Appellants do not dispute the total amounts paid to Johnson and Robinson, instead insisting that because those amounts were legitimately paid for additional work done, and because line item deviations from the budget were permitted under the grant agreement, "any additional money allocated," if outside the permitted deviations, "would be more accurately characterized as an unintentional breach of contract rather than intentional statutory fraud."  According to appellants, the

_____

(. . . continued)

underreporting of Robinson's and Johnson's compensation was $9,225 less than the $92,298 in excess compensation over budget.

[44] D.C. Code § 2-381.02 (a)(2).

[45] D.C. Code § 2-381.01 (7)(A).

element of "knowingly" cannot be met here "[b]ecause there exists a reasonable dispute as to whether costs were simply allocated incorrectly." Based on our detailed analysis of the record, however, it is clear that costs were not merely allocated incorrectly. Information provided by appellants significantly underreported – and at times did not report at all – the amounts paid to Robinson and Johnson.

Johnson was a trained and experienced accountant with sole responsibility for WEALTHY's financial records. By his own admission, Johnson, in consultation with Robinson, prepared WEALTHY's budget and budget narrative for use of the grant funds, without assistance from anyone else. Johnson also prepared the written monthly reports submitted to the Trust. Indeed, as WEALTHY's consultant in charge of financial management, Johnson had the entire universe of WEALTHY's financial transactions – from postage to compensation – under his control. Without doubt, therefore, Johnson had knowledge of WEALTHY's payments to his company (National Tax Pro) and to Robinson. He knew the allocations in the budget; he had access to every expenditure; and he prepared the monthly reports presumably based on invoices and ledger entries. Johnson also acknowledged on deposition that he was aware of

provisions in the grant agreement allowing the Trust to terminate the agreement for use of funds for an unauthorized purpose.

Based on Johnson's responsibilities and access to WEALTHY's finances, therefore, we are compelled to conclude that Johnson had statutory knowledge ("actual," "deliberate ignorance," or "reckless disregard") of the falsity of WEALTHY's compilation of monthly reports ("statements") as explained in our fourth conclusion of law, underreporting by $83,073 the compensation that Robinson and Johnson withdrew for themselves, overall totaling a false or fraudulent claim of $92,298.

**D. Material**

The District's False Claims Act defines "materiality" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."[46]  Until recently, however, federal court decisions interpreting the federal statute with the same language have been inconsistent in their interpretations of "materiality."  The United States Court of Appeals for the Eighth

---

[46] D.C. Code § 2-381.01 (8).

Circuit adopted what could be called an outcome materiality test, holding that there can be no false claim if the government would have made payments "regardless of the [plaintiff's] actions"[47] and thus was not affected by the falsity. The Fourth Circuit adopted a less stringent "natural tendency" test, which "focuses on the potential effect of the false statement when it is made, not on the actual effect of the false statement when it is discovered."[48] Thereafter, six other federal circuit courts adopted the latter, less burdensome test for materiality or its equivalent[49] (as has California).[50]

---

[47] *Rabushka ex rel. United States v. Crane Co.*, 122 F.3d 559, 563 (8th Cir. 1997).

[48] *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 916-17 (4th Cir. 2003) (*Harrison*).

[49] *United States ex rel. Loughren v. Unum Grp.*, 613 F.3d 300, 309 (1st Cir. 2010); *United States ex rel. Longhi v. Lithium Power Techs.*, 575 F.3d 458, 468-69 (5th Cir. 2009) (*Longhi*); *United States v. Bourseau*, 531 F.3d 1159, 1171 (9th Cir. 2008); *United States ex rel. A+Homecare, Inc. v. Medshares Mgmt. Grp., Inc.*, 400 F.3d 428, 445 (6th Cir. 2005) (*A+ Homecare*); *see also United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 95 (2d Cir. 2012) (*Feldman*) (adopting "objective" test for materiality that does not require evidence that falsehoods were relied upon); *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) (*Rogan*) (holding unnecessary any evidence that federal employment would have resulted in enforcement of statute because such evidence is not a component of materiality).

[50] *San Francisco Unified Sch. Dist. ex rel. Contreras v. First Student, Inc.*, 224 Cal. App. 4th 627, 642-43 (2014), *reh'g denied* (Apr. 9, 2014), *review denied* (June 25, 2014).

Late last year, however, the Supreme Court granted certiorari in a First Circuit case, *Universal Health Servs., Inc.,*[51] to resolve the threshold question whether the implied certification theory is viable under the federal False Claims Act and, if so, whether only the "express" species of impliedly false claims are viable, or whether a claim can be legally "false" under either species, "express" or "implied."[52]    In a unanimous opinion, the Court held that "the implied false certification theory can be a basis for liability," and that the contracting defendant's "liability for failing to disclose violations of [statutory, regulatory, or contractual] requirements," when claiming payment under the contract, "does not turn upon whether those requirements were expressly designated as conditions of payment."[53]  In doing so, the Court announced a new approach to materiality closer to the outcome test than to the less stringent one followed by a majority of the federal circuits.

---

[51]  *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 780 F.3d 504 (1st Cir. 2015), *cert granted*, 136 S. Ct. 582 (2015).

[52]  Petition for Writ of Certiorari, *Universal Health Servs., Inc. v. United States & Massachusetts ex rel. Julio Escobar & Carmen Correa*, 136 S. Ct. 1989 (2016) (No. 15-7), 2015 WL 4035937; see text accompanying *supra* notes 35 & 36.

[53]  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1995-96, 2001 (2016) *(Universal Health Servs., Inc.)*.

Rather than focus on whether a statutory, regulatory, or contractual condition of payment is "express" in the contract or "implied," the Court held that "[w]hat matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision."[54] The Court stressed that "[t]he materiality standard is demanding."[55]

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.[56]

The statutory test for "materiality," therefore, as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or

---

[54] *Id*. at 1996.

[55] *Id*. at 2003.

[56] *Id*.

property,"[57] appears to be "the effect on the *likely or actual* behavior of the recipient of the alleged misrepresentation"[58] upon learning about it, not on its mere potential to affect the recipient's decision. The Court expressly rejected the government's argument, in support of the First Circuit's view, that "any statutory, regulatory, or contractual violation is material so long as the defendant knows that the Government would be entitled to refuse payment were it aware of the violation."[59] Consistent with our reliance on case law interpreting the federal statute, we find no difficulty in applying the Supreme Court's "materiality" test when interpreting the District's statute here.

---

[57] D.C. Code § 2-381.01 (8).

[58] *Universal Health Servs., Inc.*, 136 S. Ct. at 2002 (quoting 26 RICHARD A. LORD, WILLISTON ON CONTRACTS § 69:12, at 549 (4th ed. 2003)) (emphasis added). The Court also cites RESTATEMENT authority stating that a "matter is material" if a reasonable person would "attach importance" to it in determining his or her "choice of action in the transaction," or if a defendant "had reason to know that the recipient of the representation" would attach importance to it "even though a reasonable person would not." *Id.* at 2002-03. We do not understand the Court, in determining materiality by reference to "the likely or actual behavior of the recipient of the alleged misrepresentation" upon learning about it, to have incorporated, further, that the defendant must have anticipated the recipient's likely response.

[59] *Id.* at 2004.

Appellants maintain that neither Johnson and his company nor any of the other principals violated any condition of the grant agreement. They are wrong. According to a key provision:

> The Trust may terminate this Grant Agreement or reduce the Grant Amount if the Grantee fails to achieve the projected outcomes of the Work Plan, to take corrective actions as stipulated by the Trust[,] or to meet its reporting requirements under this Grant Agreement as determined by the Trust's sole discretion [or] . . . upon the occurrence of any material breach of the terms and conditions of this Grant Agreement by the Grantee, including, but not limited to, using grant funds for an unauthorized purpose.

The grant agreement, therefore, obliged the grantee to honor the Work Plan, meet all reporting requirements, and use grant funds only for authorized purposes. Appellants failed in all these three respects, manifestly creating false records, resulting in false statements, to deter detection of Robinson's and Johnson's excess compensation. These false records and statements – knowingly intended to conceal the misallocation of funds and the consequent failure by WEALTHY to achieve the proposed Work Plan – were undoubtedly "material to a false or

fraudulent claim."[60]   Had the District or its agent, the Trust, been apprised of appellants' misrepresentations, more than likely the grant would have been terminated and appropriate recovery sought, a result justified by the Supreme Court's recent decision in *Universal Health Servs., Inc.*[61]

**E. Conclusion**

Based on our independent review of the record, we conclude that the District has demonstrated, without sustainable evidence to the contrary proffered by appellants, that there is no genuine issue of material fact.[62]  Moreover, on the basis of the facts of record, we agree with the District that appellants have knowingly used false statements and records material to influencing the payment of false or fraudulent claims for compensation under the District's grant, through the Trust, to

---

[60] D.C. Code § 2-381.02 (a)(2).

[61] We premise our decision on characterization of the District's claim as impliedly false, governed by the reasoning in *Universal Health Servs., Inc.*, although, as we have noted, the complaint could just as easily have been characterized as a factually false claim. We mention this only because the Supreme Court's test for "materiality" was addressed to an impliedly false claim, theoretically leaving open the possibility – which we believe is remote – that another, less stringent interpretation of materiality could apply in the factually false context.  That possibility, of course, would not affect the result here, where the *Universal Health Servs., Inc.* "materiality" test is met.

[62] See text accompanying note 13.

WEALTHY. Accordingly, we affirm summary judgment as to appellants' liability under the District of Columbia False Claims Act.

## VII. Damages

### A. Treble Damages

The trial judge awarded the District treble damages in the amount of $931,200. This amount presupposed that of the $388,000 grant to WEALTHY (net of the $12,000 administrative fee paid to the Trust), WEALTHY had received only $310,400 to which the District's claim could be addressed, because WEALTHY had received $77,600 before filing any monthly report (*i.e.*, an allegedly false statement). Counsel for the District acknowledged at oral argument that the District does not seek damages for the $77,600 advance payment to WEALTHY. District Counsel also clarified at oral argument that included in the $310,400 figure is $43,909.47 withheld by the various fiscal agents from the final amount distributed to WEALTHY. (Appellants do not question inclusion of the $43,909.47.) According to the District, therefore, WEALTHY's treble damages of $931,200 were correctly calculated based on $310,400. That total is not a certainty, however, without analysis that did not take place in the trial court.

According to the U.S. Court of Appeals for the D.C. Circuit, in calculating damages under the federal statute, "the fact-finder seeks to set an award that puts the government in the same position as it would have been if the defendant's claims had not been false."[63]  Generally, therefore, under this "benefit-of-the bargain" framework,[64] "the proper measure of damages is the difference between the value of the goods or services actually provided by the contractor and the value the goods or services would have had to the government had they been delivered as promised."[65]  But what if, as in this case, "the defendant fraudulently sought payments for participating in [government] programs designed to benefit third-parties rather than the government itself"?[66]  In that situation, the government will

---

[63]  *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1278 (D.C. Cir. 2010) (remanding federal False Claims Act case for reconsideration of liability and damages for alleged breach of contract for technical assistance to Nuclear Regulatory Commission) (dictum).

[64]  *Id*. at 1279.

[65]  *Id*. at 1278.

[66]  *United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 87-88 (2d Cir. 2012) (citation and quotation marks omitted) (false claims action to recover treble

(continued . . .)

have contracted for the intangible benefit of subsidizing a public service, but not for a direct, tangible benefit to the government itself (as in contracting, for example, for military hardware). Accordingly, as at least four federal circuits have observed: "[W]here there is no tangible benefit to the government and the intangible benefit is impossible to calculate, it is appropriate to value damages in the [full] amount the government actually paid to the Defendants."[67] "In other words, when a third-party successfully uses a false claim regarding how a grant will be used in order to obtain the grant, the government has entirely lost its opportunity to award the grant money to a recipient who would have used the

_____

(. . . continued)

damages for payments to grantees of National Institutes of Health based on misrepresentations of grant activities and personnel).

[67] *United States ex rel. Longhi v. United States*, 575 F.3d 458, 473 (5th Cir. 2009) (false claims action to recover treble damages for payments to grantees of Department of Defense under federal Small Business Innovative Research program); *accord, Feldman*, 697 F.3d at 88 (government "receives nothing of measurable value" when third-party grantee uses benefits of government grant for unapproved activities); *Sci. Applications Int'l Corp.*, 626 F.3d at 1279 (when contractor participates in program "to benefit third-parties rather than the government itself," government may establish in false claims action "that it received nothing of value" and thus "that all payments" to contractor are "recoverable as damages"); *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (government entitled to recover treble damages based on full value of fraudulent claims for reimbursement under Medicare and Medicaid programs without regard to value received by third-party patients).

money as the government intended"[68] – in which case the government cannot be said to have received any offsetting, tangible benefit.

While these cases appear to support a treble damages award based on the full amount of the District's grant to WEALTHY, this court has never addressed the calculation of damages in a False Claims Act case involving third-party beneficiaries of a government grant. We are satisfied, however, that this prevailing federal analysis is persuasive and should apply under the District's statute. We adopt it here. The District as plaintiff, of course, bears the burden of proving damages[69] and has done so *prima facie* in the amount of $310,400, as the trial court ruled. But appellants must have the opportunity to present evidence (if any) under prevailing case law that the District, to some extent, received a tangible, not merely intangible, benefit from appellants' use of the grant funds in operating WEALTHY.[70]

---

[68] *Feldman*, 697 F.3d at 88; *accord, Longhi*, 575 F.3d at 473; *Rogan*, 517 F.3d at 453.

[69] *Sci. Applications Int'l Corp.*, 626 F.3d at 1280.

[70] *See id.*

Neither party, however, has briefed the damages issue. Nor has the trial court fully come to grips with the appropriate measure of damages in light of all the facts of record and relevant decisional law. Accordingly, we do not resolve the amount of damages on appeal; rather, we remand the case to the trial court for a full examination of, and ruling on, the damages awardable to the District.

## B. Unjust Enrichment

The District concedes that its claim for unjust enrichment is an alternative theory of liability, and that "this Court would need to address the unjust enrichment claim only if the judgment under the False Claims Act is vacated." Accordingly, in affirming summary judgment for the District for damages that would appear, assuredly, to exceed the $31,973 awarded for unjust enrichment, we vacate the duplicative judgment under that theory.

## VIII. Conclusion

To summarize: we affirm summary judgment for the District's claim as to appellants' liability under the False Claims Act, but remand the case for further findings and a legal ruling to determine the appropriate amount of treble damages

consistent with this opinion. We vacate the trial court's order as to unjust enrichment.

*So ordered.*