Filed 9/8/21  Rocco v. SAP America CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| THOMAS ROCCO,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>SAP AMERICA, INC., et al.,<br><br>    Defendants and Respondents. | G058937<br><br>(Super. Ct. No. 30-2018-01011837)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Martha K. Gooding, Judge.  Affirmed in part, reversed in part.

Kasowitz Benson Torres and Jason Takenouchi for Plaintiff and Appellant.

Duane Morris and Stephen H. Sutro for Defendants and Respondents SAP America, Inc., and SAP Public Services, Inc.

Hueston Hennigan, John C. Hueston, Joseph A. Reiter and Haoxiaohan Cai for Defendant and Respondent Deloitte Consulting LLP.

Rob Bonta, Attorney General, Matthew Rodriguez, Chief Assistant Attorney General, Martin Goyette, Assistant Attorney General, Jacqueline Dale and Maria Ellinikos, Deputy Attorneys General as Amicus Curiae.

\*        \*        \*

This is an appeal from a sustained demurrer to qui tam plaintiff Thomas Rocco's fourth amended complaint alleging causes of action under the California False Claims Act (CFCA; Gov. Code, § 12650 et seq.).[1]  The City of San Diego (San Diego, or the City) initiated an overhaul of the systems it uses to track its physical assets, such as roads and sidewalks.  It hired defendants SAP America, Inc., and SAP Public Services, Inc. (collectively, SAP), to design the architecture for such a system, to draft a request for proposal (RFP) to elicit bidders to implement the system, and to evaluate the bids as they came in.  Defendant Deloitte Consulting, Inc. (Deloitte), was one of the bidders on the project.  According to the complaint, SAP and Deloitte have extensive business dealings, with Deloitte being among SAP's top 14 customers worldwide.  When a vice-president at SAP heard Deloitte was bidding, he sought to tip the scales in its favor in order to secure additional work on the San Diego project.  Deloitte did not respond to SAP's overtures, but ultimately won the bid to implement the new system.  Rocco contends SAP's conflicted advice in recommending Deloitte was a false claim under a theory of implied certification, i.e., SAP sought payment knowing it had not complied with a material term of the contract.  We agree that Rocco has adequately pleaded his claim and thus reverse the judgment of the trial court.

As to Deloitte, Rocco contends it made a claim for payment on work that was actually performed by SAP pursuant to a separate contract with the City (i.e., not a subcontractor of Deloitte).  We agree with Rocco that he adequately stated this claim as well, and thus reverse the judgment of the trial court.

Rocco raises several other contentions in his complaint that we deem inadequately pleaded.  Accordingly, we affirm the remainder of the judgment.

---

[1]     All statutory references are to the Government Code unless otherwise stated.

2

ALLEGATIONS

Beginning in 2007, San Diego began utilizing software developed by SAP to run several primary business operations, including finances, budgeting, purchasing, and human resources management. From 2012 to April 2016, Rocco was the SAP "trusted City Client Partner" assigned to servicing the City with respect to all of its software consulting needs. As the city client partner, Rocco was responsible for SAP's day to day servicing of the City's operational needs.

In 2014, SAP was hired by San Diego to design the overall architecture of an enterprise asset management (EAM) system to manage the City's infrastructure assets, such as roads, sidewalks, parks, storm drains, buildings, facilities, and wastewater assets. Because San Diego already relied on a suite of SAP applications, the EAM system was to be "SAP-centric" in order to integrate with San Diego's existing SAP applications. The eventual goal of the system was to manage the over $9.7 billion worth of infrastructure assets. Pursuant to the design engagement, SAP designed an integrated EAM system using the SAP suite of EAM tools. SAP was not tasked with actually implementing the system. This was solely a design phase. The selection of a systems integrator to oversee the implementation of the system would come later via a competitive bidding process. In fact, SAP was prohibited from bidding on the systems integrator contract. We refer to this contract as the EAM Design Contract.

In 2015, SAP entered into a separate contract with San Diego to create a request for proposal (RFP) to initiate the competitive bidding process to hire the system integrator. As part of the same contract, SAP agreed to evaluate the proposals received in response to the RFP, and act as a consultant to the City in choosing the winning bid. To that end, SAP retained the services of Sai Kiran, who served as SAP's formal evaluator to serve beside city officials. Pursuant to that appointment, Kiran signed a "Confidentiality Agreement" and agreed to "evaluate proposals submitted in response to [the EAM/SI]

3

RFP fairly and impartially." The agreement also specifies the obligation "[t]o notify the [Public Works Contracts] Deputy Director immediately: i. if any person who is not a member of the evaluation team . . . contacts . . . me about this procurement[;] ii. If a conflict of interest occurs." (Italics omitted.) The agreement further specifies that "[a] conflict of interest occurs when a[n]…elected or appointed member of City government participates directly or indirectly in the procurement process pertaining to an RFP particularly if they: [¶] a. Have a financial interest or other personal interest which is incompatible with the proper discharge of his or her official duties in the public interest or would tend to impair his or her independence, judgment or action in the performance of official duties." (Italics omitted.) We refer to this contract as the RFP Contract.

The RFP was posted in September 2015. Included in the RFP was the statement, "the City anticipates retaining, under separate contracts, the services of SAP Professional Services . . . to support the EAM project." One of the bidders who responded to the RFP was defendant Deloitte.

SAP and Deloitte had extensive business dealings prior to the San Diego project. Deloitte was dubbed a "Value-Added Reseller operating at the 'Platinum' partner level." In 2015, Deloitte was amongst SAP's top 14 international customers. SAP did not disclose these dealings to San Diego.

The two finalists for the EAM systems integrator position were Deloitte and Labyrinth Systems, Inc. (Labyrinth). A director and vice-president at SAP, Scott Porter, had a particularly low opinion of Labyrinth, describing Labyrinth in an internal e-mail as "crooks and liars," and directing SAP personnel not to provide LSI any assistance on the San Diego project. Upon learning that Deloitte and Labyrinth were finalists, Porter wrote an internal e-mail asking, "Any way we can buddy to Deloitte?" In another e-mail he asked another department head, "do you guys work with Deloitte?" Porter later directed an employee to send the following e-mail to Deloitte's managing director: "Hey Bob . . . it was mentioned that Deloitte is in the running for a project in San Diego on

4

Asset Management [EAM Systems Integrator RFP]. Our SAP Delivery and Sales Teams stand ready to support Deloitte in winning this opportunity and are happy to provide background information. SAP set up the bid process and created the RFP." That employee then forwarded the e-mail to Porter, saying, "Scott, I tapped my west coast Deloitte contact. I did not mention the partnering which I believe is implicit and will be addressed by others on the SAP Team."

These e-mails had been forwarded to Rocco, who confronted Porter about the legality of trying to partner with Deloitte. He reminded Porter that urging SAP colleagues to derogate (Labyrinth) and/or promote Deloitte (let alone share confidential City information about the RFP with Deloitte or anybody) constituted an unlawful conflict of interest and a serious breach of SAP's contractual obligations to the City. Porter disagreed. Indicating to Rocco that SAP needed to guide the City in the right direction, Porter contended it would be a mistake for the City to hire Labyrinth, and that SAP should be able to leverage pre-existing relationships with a key partner such as Deloitte in response to the RFP. Porter ended the call indicating to Rocco that this was a subject to be discussed in a future conversation, which never happened. Instead, Rocco was reassigned to a different department and instructed not to contact San Diego.

In April 2016, San Diego's City Council formally awarded the EAM systems integrator contract to Deloitte. To reach that decision, the City's infrastructure/public works interview panel reviewed proposals from both Deloitte and Labyrinth and interviewed both firms. Based on the interview panel's ranking and recommendation, the appointing authority selected Deloitte, which became a beneficiary at that time of a 3-year phase funded agreement for the EAM project, valued at approximately $20 million. We refer to this contract as the EAM/SI Contract.

After the contract was awarded, at Deloitte's urging, San Diego entered into a separate contract with SAP that required SAP to perform work that was redundant to the contract with Deloitte. In particular, Deloitte's contract required it recommend a

5

geographic information system to integrate with a mapping technology from a company called ESRI for the purpose of geographically tracking San Diego's assets (this is referred to as the Geographic Information System, or GIS for short). The contract then required Deloitte to deploy the chosen technology. In January of 2017, the City entered into a contract with SAP to perform the exact deployment Deloitte was already contractually obligated to perform. We refer to this as the GIS Contract. Deloitte never performed the deployment services, but nevertheless billed San Diego $835,883.25 for those services and was paid. Deloitte's contract with San Diego required it to submit a change order if the scope of its work were to change. Deloitte never submitted a change order concerning the work that SAP ultimately performed relating to geographic integration. SAP was ultimately paid approximately $1.6 million for the work it performed. By virtue of having prepared the RFP, SAP knew it was performing work Deloitte was contractually obligated to perform. It also knew that it was prohibited from performing such work pursuant to the terms of the contract to create the RFP.

SAP entered into two additional contracts during the implementation phase.

First, the City needed a database software that could interface with the City's existing mapping service. The City was debating between SAP's HANA software, and Microsoft's SQL software. Only Microsoft's software was certified by ESRI to be compatible. Nevertheless, SAP was able to outbid Microsoft by obtaining inside information about the amount of Microsoft's bid, which allowed SAP to undercut Microsoft's price. We refer to this as the Database Contract.

Second, in February 2017 SAP entered into a contract with San Diego for quality assurance and professional advice concerning the implementation of the EAM. We refer to this as the Quality Assurance Contract. Under the Quality Assurance Contract, SAP was to assess Deloitte's work product as well as assess the functionality of its own SAP software and its own predesign architecture.

6

PROCEDURAL HISTORY

Rocco initiated this action in April 2017. The court sustained demurrers with leave to amend as to the second and third amended complaints (the record does not reveal the disposition of the earlier complaints). The operative complaint is the fourth amended complaint (4AC), filed in July 2019 against respondents SAP America, Inc.; SAP Public Services, Inc.; and Deloitte Consulting LLP. The complaint includes the following causes of action: (1) violation of the CFCA—presentation of false claims; (2) violation of the CFCA—false statements; (3) violation of the CFCA—retention of proceeds of inadvertently submitted false claims; (4) violation of the CFCA—conspiracy; (5) violation of the CFCA—retaliation (against SAP only); (6) termination in violation of public policy (against SAP only); (7) violation of Labor Code section 1102.5 (against SAP only); and (8) violation of section 1090.

SAP and Deloitte filed separate demurrers to the 4AC, and SAP filed a motion to strike allegations concerning a violation of section 1090. In a prior round of demurrers, the court had taken judicial notice of several of the agreements and relevant documents, which were publicly available on San Diego's Web site. The court sustained the demurrer without leave to amend as to the first through fourth causes of action, as well as the eighth cause of action. Rocco appealed.

DISCUSSION

The CFCA assesses treble damages for false or fraudulent demands for payment on government entities. Section 12651, subdivision (a) enumerates eight different types of conduct that are violations of the CFCA, including, as relevant here, when the defendant: "(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;" or "(2) Knowingly makes, uses, or causes to

7

be made or used a false record or statement material to a false or fraudulent claim." A claim under CFCA commonly takes one of two forms: either an express fraudulent statement, or an implied certification, both of which are relevant to this appeal.

An express fraudulent statement is the prototypical false claim. (See CACI No. 4800; *U.S. v. Science Applications Intern. Corp.* (D.C. Cir. 2010) 626 F.3d 1257, 1266 ["In the paradigmatic case, a claim is false because it 'involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided'"].) For example, a claim is made describing services that were not actually provided or describing goods or services in materially false ways.

An implied certification, on the other hand, involves billing the government, without making any express false statement, but with the claimant knowing it had not complied with material terms of the contract. (See CACI No. 4801.) When a party makes a claim for a payment under a contract, that party impliedly certifies that it complied with all of its material obligations under that contract. If that implied certification is false, liability attaches. (See *San Francisco Unified School Dist. ex rel. Contreras v. Laidlaw Transit, Inc.* (2010) 182 Cal.App.4th 438, 453 (*Contreras I*) ["It is reasonable for governmental entities to assume that contractors seeking payment are in compliance with the material terms of their contracts. . . . . But if that same contractor is aware of . . . noncompliance and chooses to seek payment without informing the government, then it is a fraud appropriately within the scope of the CFCA"].)

"Subject to certain limitations, the False Claims Act permits a private person (referred to as a 'qui tam plaintiff' or a 'relator') to bring such an action on behalf of a governmental agency." (*Rothschild v. Tyco Internat.* (*US*), *Inc.* (2000) 83 Cal.App.4th 488, 495; § 12652, subds. (c)(1), (d).) If the action is successful, the qui tam plaintiff is entitled to a percentage of the recovery. (§ 12652, subds. (g)(2)-(5).)

"As in any action sounding in fraud, the allegations of a [CFCA] complaint must be pleaded with particularity." (*State of California ex. Rel McCann v. Bank of*

*America, N.A.* (2011) 191 Cal.App.4th 897, 906.) "The specificity requirement serves two purposes. The first is notice to the defendant, to 'furnish the defendant with certain definite charges which can be intelligently met.' [Citations.] The pleading of fraud, however, is also the last remaining habitat of the common law notion that a complaint should be sufficiently specific that the court can weed out nonmeritorious actions on the basis of the pleadings. Thus, the pleading should be sufficient '"to enable the court to determine whether, on the facts pleaded, there is any foundation, prima facie at least, for the charge of fraud."'" (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216-217, superseded on other grounds as stated in *Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 242.) We review a sustained demurrer de novo. (*Nealy v. County of Orange* (2020) 54 Cal.App.5th 594, 600.)

A. Claims Against SAP

We begin with Rocco's claims against SAP. He asserts SAP violated the CFCA in three ways: (1) SAP made a claim for conflict-free advice that SAP knew it failed to provide; (2) SAP made a claim for payment on the GIS services contract that it knew to be rigged and underpinned by fraud; and (3) SAP executed subsequent agreements that flowed from SAP's fraud during the EAM design and vendor selection process. We address each contention in turn.

1. *Conflict-free Advice*

We agree with Rocco that he has stated a claim based on a theory of implied certification with regard to SAP's conflict of interest in carrying out the RFP Contract. According to the facts of the complaint, part of the RFP contract required SAP to provide conflict-free advice in evaluating the bidders on the RFP, including Deloitte. SAP had not merely cursory dealings with Deloitte, which might be assumed for companies of their size, but substantial dealings. Deloitte was among SAP's top 14

9

customers worldwide. This degree of financial ties to Deloitte plainly presents a conflict for SAP in deciding whether to recommend it over another bidder with whom SAP has comparatively less lucrative ties. According to the complaint, this conflict was not merely theoretical, but actual: during the evaluation period, a vice-president was maneuvering behind the scenes to "leverage" SAP's "partnership" with Deloitte into additional lucrative contracts for SAP.

*U.S. v. Science Applications Intern. Corp.* (D.C. Cir. 2010) 626 F.3d 1257 is on point. There, the Nuclear Regulatory Commission hired the defendant to provide consulting advice for rulemaking concerning the disposition of radioactive materials. (*Id.* at p. 1261.) The defendant signed an agreement that prohibited it from engaging in transactions with entities that would create a conflict of interest. (*Id.* at p. 1262.) Despite that agreement, the defendant engaged in transactions with entities that would be subject to the very rules the defendant was helping to craft. (*Id.* at p. 1263.) A jury found the defendant liable. (*Id.* at p. 1264.) On appeal, the defendant argued it could not be liable because conflict-free advice was not a precondition of payment. The *Science Applications* court disagreed, reasoning as follows: "[H]ere the government contracted to buy conflict-free advice and technical assistance. . . . [T]he claims for nonconforming counseling and technical assistance were false so long as the government can establish that conflict-free services were a material condition of the contract." (*Id.* at p. 1269.)[2]

SAP was being paid to deliver conflict-free advice. It made a claim for payment which impliedly certified that it had given such advice. According to the complaint, in the absence of a disclosure to San Diego, it did not give conflict-free advice. The only remaining question is whether Rocco has adequately alleged that such advice was a "material" requirement of the contract.

_____

[2] The *Science Applications* court went on to reverse the judgment due to instructional error. (*U.S. v. Science Applications Intern. Corp.*, *supra*, 626 F.3d at pp. 1278-1279.) The court's rationale for doing so is not relevant to this appeal.

10

A false implied certification is material if it "had a natural tendency to influence, or was capable of influencing, the payment or receipt of [money] on the claim." (CACI No. 4801; *Contreras I, supra,* 182 Cal.App.4th at pp. 454-455.) Rocco alleges that the conflict-free advice was material. To substantiate that point, he provided detailed allegations of different mechanisms San Diego had for individuals to report conflicts. He also detailed several examples of contracts the City voided after discovering a conflict. He also alleges that an unrelated company, Arcadis, who had performed ancillary consulting work on the EAM system, was precluded from bidding on the systems integrator project under conflict of interest rules, as were all of Arcadis's subcontractors, regardless of their amount of participation. These allegations were sufficient to allege materiality.

In *Contreras I,* which was in the same procedural posture as we are, the court required very little of the plaintiff in alleging materiality. (*Contreras I*, *supra*, 182 Cal.App.4th at p. 455 ["Plaintiffs further allege that Laidlaw's invoices impliedly certified compliance with the material terms of the Contract, that the terms violated were material, and that the District was unaware of the falsity of Laidlaw's implied certification, resulting in a loss of District funds. Plaintiffs' allegations are adequate to survive a demurrer"].) In our view, that reflects the fact that materiality is not an issue that is easily amenable to resolution on demurrer. While some breaches of contract are so obviously trivial that we could say as a matter of law that they are not material, that is not the case here. As a matter of common sense, conflict of interest requirements are typically important to governmental entities. (See *San Francisco Unified School Dist. ex rel. Contreras v. First Student, Inc.* (2014) 224 Cal.App.4th 627, 640 (*Contreras II*) [relying on common sense to assess materiality at the pleading stage]; *U.S. v. Triple Canopy, Inc.* (4th Cir. 2017) 857 F.3d 174, 178 [same].) Whether the particular conflict at issue here was material will depend on the testimony of the decision makers, as well as a robust understanding of the overall context of the transaction, which is not available at

11

the demurrer stage. Rocco's allegations went beyond what was deemed sufficient in *Contreras I* and are thus sufficient to allege materiality. Accordingly, the court erred in sustaining the demurrer as to SAP's rendering of conflicted advice. [3]

2. *GIS Contract*

Next, Rocco contends SAP presented a false claim by making a claim for payment pursuant to the GIS Contract, which it knew to be "underpinned by fraud." (See *City of Pomona* (2001) 89 Cal.App.4th at 793, 802 [under the FCA "the claim itself need not be false but only need be underpinned by fraud"]; see also *U.S. ex rel. Hendow v. University of Phoenix* (2006) 461 F.3d 1166, 1173 ["liability will attach to each claim submitted to the government under a contract, when the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct"].) Rocco contends that SAP benefited from a quid pro quo whereby SAP recommended Deloitte for the EAM system integrator, and in exchange Deloitte agreed to recommend SAP products and services for the implementation. The problem is Rocco

---

[3] The Attorney General appeared in this proceeding as *amicus curiae* to challenge defendants' contention that a more stringent test for materiality, which was announced for the federal False Claims Act, ought to apply in this case. (*See Universal Health Services, Inc. v. U.S.* (2016) ___ U.S. ___ [136 S.Ct. 1989].) In *Universal Health Services, Inc*., the United States Supreme Court described the materiality standard as looking to "'the effect on the likely or actual behavior'" of the government. (*Id.* at p. 2002.) The court described that standard as "demanding." (*Id.* at p. 2003.) In *Contreras I*, the materiality standard was described in terms of whether the implied certification was capable of influencing the government actor. (*Contreras I, supra,* 182 Cal.App.4th at p. 454.) In a subsequent appeal from a summary judgment, the same court said the materiality test "'focuses on the potential effect of the false statement when it is made, not on the actual effect of the false statement when it is discovered.'" (*Contreras II, supra,* 224 Cal.App.4th at p. 642.) Because we decide that materiality is not easily amenable to resolution at this stage, and because we conclude Rocco's allegations were sufficient under either standard, we decline to wade into the debate of whether there is any conflict there at all between the federal and state standard, and, if so, which side is better reasoned.

12

has not alleged any particularized facts to substantiate that the quid pro quo actually occurred. Rocco alleged facts indicating that SAP was open to such an arrangement, but no facts to suggest that Deloitte actually accepted that under the table deal. When SAP e-mailed Deloitte offering to help Deloitte win the contract, Deloitte's response was noncommittal: "Thanks, I've let everyone know about your offer." This evidence was sufficient to demonstrate SAP's conflict of interest in the EAM consultation agreement, as discussed above, but not to demonstrate any actual quid pro quo in securing the GIS contract.

3. *Subsequent Contracts*

In this argument, Rocco targets two contracts: The Database Contract and the Quality Assurance Contract.

As to the Database Contract, Rocco alleges SAP obtained the contract by improperly utilizing inside pricing information about SAP's competitor's product, Microsoft's SQL software. However, Rocco never connects the dots to explain how that amounts to a false claim. Ultimately, SAP set a price, which San Diego agreed to, and SAP was paid for the exact product it promised at the exact price it promised. Utilizing inside information may have been unethical, and to the extent Kiran disclosed that information in violation of his confidentiality agreement, it may have subjected him to discipline or liability, but Rocco has not offered any explanation as to how it amounts to a false claim by SAP.

As to the Quality Assurance Contract, which gave SAP an oversight role over Deloitte's implementation of the EAM project, Rocco contends SAP failed to disclose its conflicts of interest. The Quality Assurance Contract required SAP to provide an "independent and objective examination of [San Diego's] business processes and configuration, focusing on functional applications," including the various SAP products included therein. Rocco contends that SAP's conflicts with Deloitte—its

13

myriad financial ties—renders this contract fraudulent. We disagree. Because SAP designed the architecture of the EAM system, wrote the RFP, and designed the software to run the system, it was essentially a given that SAP would get this contract. Indeed, in the RFP, which was issued before Deloitte even submitted a bid on the project, we find the following statement: "the City anticipates retaining, under separate contracts, the services of SAP Professional Services . . . to support the EAM project." SAP was going to get the Quality Assurance Contract regardless of who won the bidding contest, and thus it is not infected by any conflict with Deloitte.

B. Claims Against Deloitte

Rocco contends the complaint adequately alleged violations of the CFCA against Deloitte in three ways: (1) Deloitte made a claim for GIS work that it did not perform; (2) Deloitte convinced the City to pay SAP for GIS work that Deloitte was contractually obligated to perform; and (3) Deloitte accepted payment based on the EAM/IS contract (and a subsequent amendment), which was wrongfully awarded.

1. *Deloitte Made a Claim for GIS Work That it Did Not Perform*

Rocco's first contention presents the prototypical CFCA claim: Deloitte made a claim, and got paid, for work it did not actually do. (See *U.S. v. Scientific Applications Intern. Corp.* (D.C. Cir. 2010) 626 F.3d 1257, 1266 ["In the paradigmatic case, a claim is false because it 'involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided'"].) This cause of action was adequately pleaded. Rocco specified the exact contracts involved, described in great detail the extensive overlap between Deloitte's obligations to implement GIS and SAP's contractual obligations to do the exact same thing, and specified exactly which claims for payment are involved. That was sufficient to state a claim.

14

Deloitte contends it was known all along that the City would hire SAP for the GIS work, pointing to the portion of the RFP that said, "'[T]he City anticipates retaining, under separate contracts, the services of SAP . . . to support the EAM project.'" However, that statement was not specific as to which contracts SAP would be retained to perform. As we noted above, the most obvious contender was the Quality Assurance Contract. More importantly, even if it was anticipated that SAP would perform the GIS work, that does not explain why Deloitte allegedly billed the City for the exact same services—services it did not actually perform.

Deloitte also contends Rocco's allegations are insufficiently specific. It argues: "For example, Plaintiff does not identify the City employees who negotiated the contracts or approved the invoices; nor does he explain how they could have been misled or by whom." We agree that those facts would have been helpful, and though we deem it a close case, we conclude the allegations are, nonetheless, adequate. Rocco's allegations are highly specific in which aspects of the GIS Contract overlaps with the EAM/SI contract, and the comparison is not a vaguely similar description, but instead very specific and nearly identical in many respects. Paragraph 160 of the 4AC contains a side by side comparison of several key provision of the contracts defining their scope. For example: SAP: "Capability for GIS feature symbology based on SAP data attributes"; Deloitte: "Capability for GIS feature symbology based on SAP data attributes"; SAP: "Ability to navigate between GIS features and corresponding SAP Plant Maintenance data objects"; Deloitte: "Ability to seamlessly navigate between GIS features and corresponding SAP data objects"; SAP: "Ability to associate geometry for transactional data (Work Order, Notification, Project WBS) without a reference master data object"; Deloitte: "Ability to associate geometry for plant maintenance transactional data without a reference master data object." The list goes on, containing a total of 11 comparisons that all appear to be asking the two companies to perform redundant work.

15

As we explained above, the purpose of the heightened pleading standard is twofold: to apprise the defendant of exactly the nature of the claim, and to weed out unmeritorious claims. Rocco's allegations fulfill both of those purposes. Deloitte knows exactly what the claim is, and Rocco's allegations are specific enough to at least suggest the possibility that Deloitte, in fact, billed for work it did not perform.

2. *Deloitte Convinced the City to Pay SAP for GIS Work That Deloitte Was Contractually Obligated to Perform*

There are insufficient allegations in the complaint to support this contention. The entire argument hinges on a single line in the complaint: "Deloitte advised City to hire SAP to perform [the GIS work] required to be performed by Deloitte under contract H166584." This allegation does not have the level of specificity required of a fraud cause of action. There is no allegation regarding who at Deloitte made this recommendation, who they spoke to at the City, and how they managed to achieve the result of convincing the City to contract the exact same services twice.

3. *Deloitte Accepted Payment Under a Wrongfully Awarded Contract*

This claim likewise fails. As we noted above, nothing in the complaint indicates Deloitte ever accepted SAP's alleged offer to improperly collude on the EAM bid. And the complaint contains no particularized allegations to suggest that Deloitte was conflicted in its performance of the EAM contract.

C. Section 1090

"Under section 1090, government officials and employees cannot be financially interested in any contract made by them in their official capacity or by any body of which they are a member. The statute codifies the long-standing common law rule prohibiting public officials from having personal financial interests in contracts they

16

form in their official capacities." (*San Diegans for Open Government v. Public Facilities Financing Authority of City of San Diego* (2019) 8 Cal.5th 733, 736 (*San Diegans for Open Government*).) "Every contract made in violation of any of the provisions of Section 1090 may be avoided at the instance of any party except the officer interested therein." (§ 1092, subd. (a).) In *San Diegans for Open Government*, our high court held that the expression "any party" in the foregoing statute means only parties to a contract have standing under sections 1090 and 1092. (*San Diegans for Open Government*, at pp 740-741.) SAP contends this holding deprives Rocco of standing to pursue his section 1090 claims. Rocco contends *San Diegans for Open Government* does not apply to qui tam plaintiffs such as himself.

We agree with SAP. "A qui tam action has been defined as follows, 'An action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive.'" (*People ex rel. Allstate Ins. Co. v. Weitzman* (2003) 107 Cal.App.4th 534, 538.) Consistent with that definition, the CFCA specifically authorizes a qui tam action: "A person may bring a civil action for a violation of this article for the person and either for the State of California in the name of the state, if any state funds are involved, or for a political subdivision in the name of the political subdivision, if political subdivision funds are exclusively involved. The person bringing the action shall be referred to as the qui tam plaintiff." (§ 12652, subd. (c)(1).) As our high court observed in *San Diegans for Open Government*, however, section 1090 contains no such authorization, but instead only authorizes a party to the contract to avoid it under section 1092. (*San Diegans for Open Government*, *supra*, 8 Cal.5th at pp. 736-737.) Accordingly, there is no statutory authority for Rocco to operate as a qui tam plaintiff for purposes of section 1090. He is simply a private citizen, and under *San Diegans for Open Government*, he has no standing. Accordingly, the court did not err in striking his causes of action and requests for relief under section 1090.

17

In the alternative, Rocco asks us to deem his cause of action to be pursuant to Code of Civil Procedure section 526a. "Code of Civil Procedure section 526a permits a taxpayer to bring an action to restrain or prevent an illegal expenditure of public money. No showing of special damage to a particular taxpayer is required as a requisite for bringing a taxpayer suit. [Citation.] Rather, taxpayer suits provide a general citizen remedy for controlling illegal governmental activity." (*Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16, 29.) In *San Diegans for Open Government*, our Supreme Court agreed that "Code of Civil Procedure section 526a is, as a general rule, available to taxpayers who wish to challenge government contracts affected by financial conflicts of interest." (*San Diegans for Open Government*, *supra*, 8 Cal.5th at p. 746.) Rocco did not bring his claim pursuant to Code of Civil Procedure section 526a. However, because *San Diegans for Open Government* was filed after the trial court's ruling in this case, we will instruct the court to give Rocco an opportunity to amend his complaint to attempt to state a claim pursuant to Code of Civil Procedure section 526a.

DISPOSITION

Applying our analysis above to each of Rocco's causes of action, we rule as follows:

First cause of action: the judgment is reversed as to SAP's alleged conflicted advice in performing the RFP Contract, and reversed as to Deloitte regarding the claims it was alleged to have made under the EAM/SI Contract that were for work performed by SAP pursuant to the GIS Contract.

Second cause of action: the judgment is reversed as to Deloitte regarding the claims it was alleged to have made under the EAM/SI Contract that were for work performed by SAP pursuant to the GIS Contract.

18

In all other respects, the judgment is affirmed, except that the court is instructed to permit Rocco an opportunity to amend his complaint to state a claim under Code of Civil Procedure section 526a.  Rocco is entitled to his costs incurred on appeal.


THOMPSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.